# EXHIBIT A1

SHAWN ANTHONY MCMILLIAN
3349 Bodero Lane, Apt. #2
Chico, CA 95973
Phone: (530) 809-5439
Email: samcmillian86@icloud.com

Plaintiff, In Pro Per

F I L E D
Superior Court of California
County of Butte

APR 28 2026

Sheriff Elmellah Clerk
By _____ Deputy

F I L E D

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF BUTTE

SHAWN ANTHONY MCMILLIAN, Case No. _____ 26CV01432
    Plaintiff,

v.

WALMART INC.,
    Defendant.

COMPLAINT FOR DAMAGES
JURY TRIAL DEMANDED

Dept. _____
Judge: _____

## COMPLAINT FOR DAMAGES

### JURY TRIAL DEMANDED

Plaintiff Shawn Anthony McMillian ("Plaintiff"), appearing in pro per, alleges as follows against Defendant Walmart Inc. ("Defendant"):

### FACTUAL BACKGROUND

1. In or around 2015, Plaintiff used IdeasWatch.com, a startup-idea submission platform that Plaintiff alleges appeared connected to Google developers and required or relied on Google authentication.

2. Between approximately April and October 2015, Plaintiff submitted original concepts through IdeasWatch, including pickup, delivery, delegated pickup, mobile-commerce, and related technology concepts.

3. On or about May 27, 2015, Plaintiff submitted his Shop and Pick-Up App concept, involving online ordering, designated pickup times, curbside loading, and delivery-service integration.

4. Plaintiff alleges that Walmart was specifically identified as a target company or practical implementer for the pickup and delivery concepts he submitted.

5. On or about August 17, 2015, Walmart Apollo, LLC filed UK Patent Application GB2544005, titled Drive through grocery pickup, which Plaintiff alleges overlapped with his earlier 2015 submission.

6. Plaintiff alleges Walmart later expanded pickup and delivery services in ways that overlapped with Plaintiff's concepts, including curbside pickup, online ordering, delegated pickup, and delivery-related integrations.

7. Plaintiff alleges IdeasWatch was later placed in read-only mode and then purged or made inaccessible, preventing Plaintiff from retrieving his original submissions and limiting his ability to preserve evidence.

8. Plaintiff alleges Walmart benefited from Plaintiff's concepts without authorization, attribution, compensation, or proper investigation after notice.

### 1. NATURE OF THE ACTION

9. This Complaint arises from Plaintiff's allegations that Walmart Inc. knowingly benefited from Plaintiff's IdeasWatch.com submissions, including "The Shop and Pick-Up App," "Shop & Deliver," delegated pickup/delivery concepts, drone delivery concepts, and agentic AI shopping concepts, then launched and patented substantially similar commercial systems without credit, compensation, or acknowledgment.

10. Plaintiff brings this action for damages, equitable relief, restitution, public recognition, preservation of evidence, and any other relief the Court deems just and proper.

11. This Complaint is based on the facts set out in Plaintiff's attached Declaration of Shawn Anthony McMillian in Support of Complaint and the referenced exhibits, including Exhibits 1 through 40 and Exhibits 35-K through 35-Q.

12. Plaintiff alleges that his original concepts, app ideas, equations, and digital identity were exploited without authorization, compensation, or credit.

13. Plaintiff alleges that the conduct caused severe emotional distress, loss of opportunity, loss of prior art, reputational harm, loss of potential generational wealth, and harm to Plaintiff and his family.

14. Plaintiff demands a jury trial on all issues triable by jury.

## 2. PARTIES

15. Plaintiff Shawn Anthony McMillian is an individual residing in Chico, Butte County, California.

16. Defendant Walmart Inc. is a corporation or limited liability company doing business in California and within the United States.

17. Plaintiff is informed and believes that Defendant conducts substantial business affecting California residents and benefits from California markets, customers, data, and technology infrastructure.

18. Plaintiff is informed and believes that additional Doe defendants, named as DOES 1 through 50, may be responsible for the acts alleged in this Complaint. Plaintiff will amend this Complaint when their true names and capacities are discovered.

## 3. JURISDICTION AND VENUE

19. Jurisdiction is proper in the Superior Court of California because Plaintiff seeks damages and relief under California law.

20. Venue is proper in Butte County because Plaintiff resides in Butte County, Plaintiff experienced injury in Butte County, and Plaintiff prepared, submitted, discovered, and preserved much of the evidence from Butte County.

## 4. GENERAL FACTUAL ALLEGATIONS

21. In 2015, Plaintiff was a barber in Chico, California, a former Walmart associate, and an independent innovator using his iPhone to create and submit original ideas.

22. Plaintiff discovered IdeasWatch.com through a promoted website he encountered while searching on Safari using Google.

23. Plaintiff alleges that IdeasWatch.com used Google authentication and required Plaintiff to sign in with his Google email and password.

24. Plaintiff alleges that the Google login process made IdeasWatch appear credible and trustworthy.

25. Plaintiff alleges that he submitted approximately 202 original startup concepts to IdeasWatch.com between April and October 2015.

26. Plaintiff alleges that only two of his 202 ideas were flagged by the platform and that the remaining ideas were published as original under the platform's process.

27. Plaintiff's alleged ideas included, among many others, "The Shop and Pick-Up App," "Shop and Deliver," "Find a Friend," drone delivery into vehicles, autonomous assistant concepts, independent truck driver applications, independent car rental applications, satellite/home connectivity concepts, tracking technologies, and equations/codes related to software and AI uses.

28. Plaintiff alleges that his IdeasWatch pages, idswt.ch URLs, and profile data were publicly indexed, archived, cached, and later deleted or obscured.

29. Plaintiff alleges that the Internet Archive captured some of the idswt.ch URLs and that Common Crawl and AI-training pipelines could have incorporated public web materials.

30. Plaintiff alleges that Maintop Businesses, IdeasWatch, RiteTag, RiteKit, Rite.ly, Rysun Labs/KCS, Accenture, and other technology partners functioned in an interconnected ecosystem that benefited Defendant.

31. Walmart is alleged to be a direct commercial beneficiary because Plaintiff alleges that Walmart implemented pickup, delivery, drone, and agentic AI commerce concepts after Plaintiff's 2015 submissions and after Walmart was placed on notice through direct communications, LinkedIn connections, counsel correspondence, and exhibit packets.

32. Plaintiff alleges that the platform later entered read-only mode, produced server errors, was parked or repurposed, and that data was allegedly purged after Plaintiff escalated complaints to government agencies.

33. Plaintiff alleges that this sequence supports an inference of evidence suppression, spoliation, data movement, and concealment.

34. Plaintiff alleges that he repeatedly sought recognition, investigation, preservation of evidence, and compensation.

35. Plaintiff alleges that Defendant failed to provide a fair remedy, failed to preserve or account for the use of Plaintiff's intellectual materials, and failed to correct the alleged exploitation.

36. Plaintiff incorporates by reference all factual allegations and exhibits in his Declaration in Support of Complaint.

### 5. FIRST CAUSE OF ACTION – NEGLIGENCE

37. Plaintiff realleges paragraphs 1 through 36.

38. Defendant owed Plaintiff a duty to act with reasonable care in handling, benefiting from, supervising, verifying, receiving, using, or responding to Plaintiff's data, ideas, prior art, and related complaints.

39. Defendant breached that duty by failing to prevent foreseeable misuse, exploitation, deletion, concealment, or commercialization of Plaintiff's intellectual materials without credit or compensation.

40. Defendant's breach was a substantial factor in causing Plaintiff harm, including emotional distress, reputational harm, loss of opportunity, and loss of proof.

### 6. SECOND CAUSE OF ACTION -- CONVERSION / WRONGFUL EXERCISE OF CONTROL OVER PROPERTY

41. Plaintiff realleges paragraphs 1 through 40.

42. Plaintiff owned or had a possessory interest in his original writings, ideas as expressed in dated submissions, equations, communications, digital identity, account data, and related materials.

43. Defendant wrongfully exercised control over, benefited from, or facilitated the use of those materials without Plaintiff's authorization, recognition, or compensation.

44. Plaintiff was harmed by the wrongful exercise of control and seeks damages and equitable relief.

### 7. THIRD CAUSE OF ACTION -- MISAPPROPRIATION OF IDEAS / IMPLIED-IN-FACT USE WITHOUT COMPENSATION

45. Plaintiff realleges paragraphs 1 through 44.

46. Plaintiff disclosed concrete, original, commercially valuable concepts through IdeasWatch and related communications.

47. Plaintiff alleges that the circumstances created an expectation that his ideas would be treated fairly and that he would receive credit, partnership, payment, or other benefit if they were used.

48. Defendant used, benefited from, or commercially implemented concepts substantially similar to Plaintiff's submissions without compensation.

49. Plaintiff seeks damages, restitution, recognition, and equitable relief.

### 8. FOURTH CAUSE OF ACTION -- UNJUST ENRICHMENT / RESTITUTION

50. Plaintiff realleges paragraphs 1 through 49.

51. Defendant received benefits from Plaintiff's ideas, submissions, equations, and prior art.

52. Defendant's retention of those benefits without recognition or compensation would be unjust.

53. Plaintiff seeks restitution, disgorgement, constructive trust, and any other equitable relief allowed by law.

### 9. FIFTH CAUSE OF ACTION – VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW, BUS. & PROF. CODE § 17200

54. Plaintiff realleges paragraphs 1 through 53.

55. Defendant engaged in unlawful, unfair, or fraudulent business acts or practices by

allegedly benefiting from predatory innovation harvesting, misleading trust signals, data movement, suppression of prior art, and commercialization of Plaintiff's concepts without fair attribution or compensation.

56. Plaintiff seeks restitution, injunctive relief, public corrective disclosures, preservation orders, and all relief available under the UCL.

## 10. SIXTH CAUSE OF ACTION -- FRAUDULENT CONCEALMENT / NONDISCLOSURE

57. Plaintiff realleges paragraphs 1 through 56.

58. Plaintiff alleges Defendant concealed, failed to disclose, or failed to correct material facts about the relationship between the platform, the authentication/partner ecosystem, data movement, commercial use, and destruction or suppression of Plaintiff's evidence.

59. Plaintiff reasonably relied on the apparent trust and legitimacy of the platform and the later silence or non-denials of involved parties.

60. Plaintiff was harmed as a result.

## 11. SEVENTH CAUSE OF ACTION -- SPOLIATION-RELATED EQUITABLE RELIEF / EVIDENCE PRESERVATION

61. Plaintiff realleges paragraphs 1 through 60.

62. Plaintiff alleges that evidence, platform data, account information, URLs, archives, communications, logs, and prior art were deleted, obscured, purged, or made unavailable after Plaintiff complained and escalated the matter.

63. Plaintiff seeks all available evidentiary, equitable, discovery, preservation, adverse-inference, and sanctions-related relief permitted by California law and court procedure.

## 12. EIGHTH CAUSE OF ACTION – INVASION OF PRIVACY / MISUSE OF PERSONAL INFORMATION

64. Plaintiff realleges paragraphs 1 through 63.

65. Plaintiff alleges that his personal information, profile data, email-linked identity, submissions, and account materials were exposed, commercialized, or used beyond the scope of his informed consent.

66. Plaintiff alleges that this misuse caused emotional distress, humiliation, and loss of control over his digital identity.

## 13. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

1. Compensatory damages according to proof;

2. Restitution and disgorgement of profits according to proof;

3. Punitive or exemplary damages where permitted by law;

4. Injunctive relief requiring preservation of evidence, production of records, and corrective disclosures;

5. A declaration recognizing Plaintiff's alleged prior art and authorship of the submitted concepts;

6. Costs of suit and any allowable fees;

7. Prejudgment and postjudgment interest as allowed by law;

8. Any other relief the Court deems just and proper.

## 14. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 28, 2026

Shawn Anthony McMillian
Plaintiff, In Pro Per

SHAWN ANTHONY MCMILLIAN
3349 Bodero Lane, Apt. #2
Chico, CA 95973
Phone: (530) 809-5439
Email: samcmillian86@icloud.com



Plaintiff, In Pro Per

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF BUTTE

## 26CV 0 1432

SHAWN ANTHONY MCMILLIAN, Case No. _____
    Plaintiff,

v.

WALMART INC.,
    Defendant.

DECLARATION OF SHAWN ANTHONY
MCMILLIAN
IN SUPPORT OF COMPLAINT

Dept. _____
Judge: _____

---

## DECLARATION OF SHAWN ANTHONY MCMILLIAN IN SUPPORT OF COMPLAINT

I, Shawn Anthony McMillian, declare under penalty of perjury under the laws of the United States and the State of California that the following is true and correct.

1. In early 2015, I was a barber in Chico, California, a former Walmart associate at Store #2044. I used my iPhone to create and submit original ideas.

2. While searching on Safari using Google, I saw a promoted website: IdeasWatch.com. The website said I could share my ideas with Android developers. (Exhibit 1 – screenshot of IdeasWatch homepage.)

3. When I clicked "Sign Up," the only option presented to me was to sign in with my Google email and password. (Exhibit 2 – screenshot of Google OAuth login requirement.)

4. I submitted approximately 202 original startup concepts to IdeasWatch.com between April and October 2015. Only two were flagged as "already exist," and those two were later acknowledged by founders as original and predating their own work. The remaining ideas were published as original. (Exhibit 3 – dossier of 202 ideas; Exhibit 7 – platform flags and later acknowledgments.)

5. My ideas included, among others, "The Shop and Pick-Up App" (May 27, 2015), "Shop and Deliver," "Find a Friend," drone delivery into vehicles, an autonomous assistant concept dated September 27, 2015, an independent truck driver app, an independent car rental app, and equations/codes. (Exhibit 3; Exhibit 9 – equations sent to KCS.)

6. On July 2, 2015, I participated in an email thread titled "Re: Idea Discussion" with Rahul Dandamudi, Sandeep Reddy, and Sagar Chalavadi. I provided a full product vision in that thread. (Exhibit 8 – email thread.)

7. On July 13, 2015, I sent two emails to Chiles Ponda at KCS, now Rysun Labs, attaching my original ideas and equations. KCS initially communicated about developing my ideas and later stopped communicating. (Exhibit 9.)

8. On November 29, 2015, Saul Fleischman, a co-founder of IdeasWatch, emailed me from a Gmail address. He wrote that if I did not want my ideas public, I should not submit them to IdeasWatch. (Exhibit 6.)

9. On August 17, 2015, less than three months after my "Shop and Pick-Up App" submission, Walmart Apollo, LLC filed UK Patent Application GB2544005 titled "Drive through grocery pickup." The patent abstract describes features and a computer-implemented method that I believe are substantially similar to my concept. (Exhibit 15.)

10. In September 2015, Walmart launched its free online grocery pickup service in

multiple cities, using "Shop & Pickup" or similar wording and a workflow that I believe overlapped with my May 27, 2015 submission.

11. In 2017, I connected on LinkedIn with John Furner, who later became Global CEO of Walmart. (Exhibit 10 – LinkedIn connection.)

12. Christy Womack, assistant to former Walmart CEO Doug McMillon, emailed me on his behalf. (Exhibit 12.)

13. Walmart later launched "Shop & Deliver" for its Spark driver platform, which I believe mirrors my "Shop and Deliver" concept.

14. My IdeasWatch pages and idswt.ch URLs were captured by the Internet Archive, including http://idswt.ch/MzExMg== on September 14, 2015. (Exhibit 17.)

15. In October 2020, my DOJ complaint was referred to the Antitrust Division. (Exhibit 20.)

16. In November 2020, IdeasWatch was placed into "read-only mode." (Exhibits 35-E, 35-M.) Later, server errors appeared. (Exhibits 35-D, 35-N.) By 2023, Maintop claimed the data was permanently purged. (Exhibit 21.)

17. The ideaswatch.com domain was later parked and displayed advertisements for Rite.ly and RiteKit. (Exhibits 35-F, 35-O.)

18. Google search results for "Shawn McMillian IdeasWatch" displayed my profile and identified me as "Founder of Walmart Shop & Pick-Up (Curbside)." (Exhibit 35-K.)

19. IdeasWatch categorized ideas by corporate targets including "Uber," "Apple," "Government," "Market Analysis," "Fair," and "Social Platform." (Exhibit 35-P.)

20. Walmart partnered with Google Wing for drone delivery, which I believe is similar to my July 28, 2015 drone delivery concept. (Exhibit 24.)

21. In January 2026, Walmart and Google announced agentic AI commerce embedded in Google Gemini, which I believe is similar to my September 27, 2015 "Autonomous Assistant" concept. (Exhibit 25.)

22. On February 4, 2026, the EEOC issued me a Right-to-Sue letter (Charge No. 556-2025-00967) that was addressed to both Google and Walmart. I believe this error violated my privacy and compromised my ability to find counsel. (Exhibit 33.)

23. I requested a supervisor review from the EEOC. (Exhibit 34.)

24. I sent Walmart a formal demand letter with the subject line: "Formal Demand for Settlement and Preservation of Evidence – Misappropriation of 'Walmart Shop & Pickup' slogan and exploitation of interconnected delegated pickup/delivery concepts." (Exhibit 38.)

25. Walmart's counsel responded with the subject line: "RE: Shawn Anthony McMillian v. IdeasWatch." They did not directly address the substance of my claimed prior submissions in the subject line. (Exhibit 39.)

26. On March 29, 2026, I emailed my equations to Google attorney Michael Pfyl and EEOC representative Lisa Fung. (Exhibit 37.) Two days later, Google published "TurboQuant," which I believe describes a method related to functions discussed in my equation materials. (Exhibit 36.)

27. The platform's read-only mode, server errors, domain parking, and later claimed data purge occurred after I escalated my complaints. This prevented me from accessing my original submissions and prior art.

28. I have suffered emotional distress, reputational harm, loss of opportunity, loss of prior art, and loss of potential generational wealth as a result of Walmart's alleged use of my concepts without credit or compensation.

29. I ask the Court to consider the attached exhibits and order any relief the Court finds appropriate, including damages according to proof, preservation of evidence, production of relevant records, restitution where available, and any other relief allowed by law.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this 28th day of April, 2026, in Chico, California.

_____
Shawn Anthony McMillian
Plaintiff, In Pro Per

[All exhibits referenced above – Exhibits 1 through 40 and Exhibits 35-K through 35-Q – are attached as separate pages.]

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

San Jose Local Office
96 N Third St, Suite 250
San Jose, CA 95112
(408) 889-1950
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: February 4, 2026

**To:** Mr. Shawn A. McMillian
3349 Bodero Lane, Apt #2
Chico, CA 95973

Charge No: 556-2026-00337

EEOC Representative and email:    LISA FUNG
SENIOR INVESTIGATOR
LISA.FUNG@EEOC.GOV

## DETERMINATION AND NOTICE OF RIGHTS

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

## NOTICE OF YOUR RIGHT TO SUE

This is official notice that the EEOC has dismissed your charge and has issued you notice of your right to sue the respondent(s) on this charge. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of EEOC's official notice of dismissal.** You should keep a record of the date you received the EEOC's official notice of dismissal. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 556-2026-00337.

On behalf of the Commission,

Digitally signed by
**Margaret Ly** Margaret Ly
Date: 2026.02.04
16:22:12 -08'00'

Margaret Ly
Local Office Director

**Cc:**
Scott Forman
Littler Mendelson, P.C.
2301 McGee Street Suite 800
Kansas City, MO 64108


Please retain this Notice for your records.

Enclosure with EEOC Notice of Closure and Rights (05/25)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court **under Federal law**. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

### IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* EEOC's official notice of dismissal. You should keep a record of the date you received EEOC's official notice of dismissal**. Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving EEOC's official notice of dismissal (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA, the ADEA, or the PWFA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA, the ADEA, or the PWFA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of your receipt of EEOC's official notice of dismissal and within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

### ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

### HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a Freedom of Information Act (FOIA) request or 2) a "Section 83" request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of EEOC's official notice of dismissal, please submit your FOIA and/or Section 83 request for the charge file promptly to allow sufficient time for EEOC to respond and for your review.

**To make a FOIA request for your charge file**, submit your request online at https://eeoc.arkcase.com/foia/portal/login (this is the preferred method).  You may also submit a

STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency

GAVIN NEWSOM, GOVERNOR

KEVIN KISH, DIRECTOR

## Civil Rights Department

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
800-884-1684 (voice) | 800-700-2320 (TTY) | California's Relay Service at 711
www.calcivilrights.ca.gov | contact.center@dfeh.ca.gov

EEOC Number:   556-2026-00337

Case Name:   Mr. Shawn A. McMillian v. Walmart

Filing Date:   February 4, 2026

## NOTICE TO COMPLAINANT AND RESPONDENT

This is to advise you that the above-referenced complaint is being dual filed with the California Civil Rights Department (CRD) by the U.S. Equal Employment Opportunity Commission (EEOC). The complaint will be filed in accordance with California Government Code section 12960. This notice constitutes service pursuant to Government Code section 12962.

The EEOC is responsible for the processing of this complaint. Please contact EEOC directly for any discussion of this complaint or the investigation.

## NOTICE TO COMPLAINANT OF RIGHT TO SUE

This letter is also your Right to Sue notice. **This Right to Sue Notice allows you to file a private lawsuit in State court**. According to Government Code section 12965, subdivision (c), you may bring a civil action under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The lawsuit may be filed in a State of California Superior Court. Government Code section 12965, subdivision (c), provides that such a civil action must be brought within one year from the date of this notice. Pursuant to Government Code section 12965, subdivision (e)(1), this one-year period will be tolled during the pendency of the EEOC's investigation of your complaint. You should consult an attorney to determine with accuracy the date by which a civil action must be filed. This right to file a civil action may be waived in the event a settlement agreement is signed.

Be advised, CRD does not retain case records beyond three years after a complaint is filed.

CRD-200-02 (09/2022)

# DECLARATION AND EVIDENCE PACKET

**Shawn Anthony McMillian v. Walmart Inc., Google LLC, Maintop Businesses s.r.o., et al.**

**U.S. District Court, Eastern District of California**

**Filed: April 27, 2026**

## Walmart SERVICE COPY



1 Message                                    ᗴ Summarize

  From: Shawn Mcmillian
                      To:   Jared Melton
                            Megan Redmond        Melissa Jobe
                            Nikki Shaw
                      Cc:   LISA FUNG
                            sanjgov@eeoc.gov
                      Today at 10:05 PM

# Formal Service of Declaration and Evidence Packets – Shawn Anthony McMillian v. Walmart Inc., Maintop Businesses s.r.o., et al.

Download Attachments
Available until May 27, 2026

To Whom It May Concern,

Please accept this email as formal electronic service and notice of the attached Declaration and Evidence Packets in the matter of:

Tap to Download
**Mr.McMillian_Declaration_Eviden ce_Serving_Walmart .pdf**
39.2 MB

Tap to Download
**Mr.McMillian_Walmart_Additional _Evidence_Packet__.pdf**
1.9 MB

Sh        ʼan v. Walmart Inc., M⋯

DECLARATION OF SHAWN ANTHONY MCMILLIAN IN SUPPORT OF COMPLAINT

(All Evidence and Exhibit Numbers Included – Expanded and Argumentative Version)

I, Shawn Anthony McMillian, declare under penalty of perjury under the laws of the United States and the State of California that the following is true and correct.

## 1. HOW I DISCOVERED THE PLATFORM THAT DESTROYED MY DIGITAL RIGHTS – AND WHY I BELIEVED IT WAS GOOGLE

· In early 2015, I was a dreamer. I was a barber in Chico, California, a former Walmart associate, and a man with ideas that could change the world. I did not have a Silicon Valley pedigree. I did not have venture capital. I had only my iPhone and my hope.
· One day, while searching on my iPhone's Safari browser using Google, I saw a promoted website: IdeasWatch.com.
· The website said I could share my ideas with Android (Google) developers from around the world and turn them into real startups. I was sold instantly – not just by the promise, but by the credibility of Google (Exhibit 1 – screenshot of IdeasWatch homepage).
· When I clicked "Sign Up," I had no choice: I had to use my original Google email and password. There was no alternative. No "Sign up with Facebook." No "Create an account with your own username." Only Google.
· In 2015, I had never – not once – come across any other website that required my official Google login. That felt like an endorsement. It felt like Google itself was opening a door for people like me (Exhibit 2 – screenshot of Google OAuth login requirement).
· I was blown away by the opportunity. All I had to do was come up with original apps, products, inventions – and Google and its developers would help make my dreams come true.
· I trusted Google. And that trust was the weapon used against me.

## 2. MY DREAMS CAME TRUE – FOR EVERYBODY BUT ME

 I named Walmart – the company where I once worked – in my startup pitches because I loved it and wanted to help it win against Amazon. I named many other companies I admired.
· My ideas reached all of them – but with no acknowledgement, no recognition, no credit, no compensation (Exhibit 3 – dossier of 202 original ideas with submission dates, including "The Shop and Pick-Up App," "The Independent Truck Drivers App," "Drone Deliver Food Into Vehicles," "Autonomous Assistant," and dozens more).
· IdeasWatch was an Android-heavy operator. Everyone I dealt with through that incubator was

connected to Google's partners. And those same partners later deepened their ties with Walmart.

· Let me be clear: I gave Walmart the blueprint for its most profitable services. And in return, Walmart gave me nothing but silence and legal jargon.

## 3. GOOGLE IS THE CROWN CENTERPIECE OF THIS EXPLOITATION

· Google is the reason my digital civil rights were violated, exploited, abused, and discriminated against. Period.

· The entire conspiracy – Google, Maintop Businesses, RiteTag, Walmart, Rysun Labs, and the Google Cloud BigQuery ecosystem – all worked together to gain access to my sensitive, confidential information (Exhibit 4 – diagram of the Google Cloud "inadvertent ecosystem" and public records showing Rysun Labs as Google Cloud Partner, Accenture as Google Cloud Global Partner of the Year, etc.).

· They used Google's trust systems to unfairly enrich themselves, their partners, and their developers. Everything functions as one network. And that network is Google.

· Ask yourself: If a company makes Google money through multiple layers of transactions and is an official partner – even a foreign partner like IdeasWatch (Czech Republic) and RiteKit/RiteTag (Japan) – then to the everyday person, that company is Google.

· If it looks like a dog, sounds like a dog, and acts like a dog… it's a dog. IdeasWatch mirrored Google. It was a tech incubator for startup ideas with Android developers from around the world. Android is owned by Google.

· And there were no disclaimers on the site saying, "This is not a Google company." How can Google claim ignorance when it dressed its partner in its own clothes?

## 4. THEY NEVER TOLD ME THE TRUTH – NOT EVEN AFTER I ASKED

· As you can see in my exhibits, I emailed Michal Hudeček at RiteTag's official email address, and I put "Google" in the email (Exhibit 5 – July 13, 2015 email "Hey Michal & Google!").

· No one ever told me IdeasWatch was not a Google company. Not then. Not ever.

· Even months later, when Saul Fleischman replied, he never said he wasn't Google. He emailed me from Gmail – not ideaswatch.com, not ritetag.com, but Gmail.

· He wanted me to call him on Google+, not Skype. Why? Because he was still advertising that he was Google. And to me, he was.

· His website had the official Google login. His email came after I had already shared my 202 startup inventions. Then he tried to get me to share more by saying, "Kindly consider and make that decision" (Exhibit 6 – full email from Saul Fleischman, November 29, 2015).

· He wanted me to be okay with being discriminated against and exploited – all while wearing Google's image. And Google let him.

# 5. THE MOST DECEPTIVE SOCIAL MEDIA SITE EVER CREATED

· With everything going on with social media addiction cases in America – including a $6 million verdict against Google just last month – this is the ultimate deceptive practice: combining a social media platform with a startup incubator that verifies your original inventions as original.

· Only 2 out of my 202 startup pitches were flagged as "already exist" – and those two were later proven to be original by the founders of the very products that supposedly already existed (Exhibit 7 – IdeasWatch dashboard showing "these exist, please research before submitting," and later acknowledgments from product founders).

· This site housed Android developers from around the world, allowing this scam and predatory site to thrive and prey on unsuspecting, underserved, under-resourced individuals like me.

· Saul Fleischman's email explicitly stated the verification process (Exhibit 6):

"What I tell people is that if your idea is fairly original, very well detailed – as a business – and if you did research on the web to find that it does not already exist, we will probably publish it."

· Of the 202 ideas I submitted, only two were flagged with the note "these exist, please research before submitting" – "The Make Your Face and Hair App" and "Turning your cellphone or pad into desktop state."

· The remaining 200 ideas were deemed original by the platform's own standards and were published.

· Critically, the two flagged ideas were later acknowledged by founders of the relevant products as being original and predating their own work.

· This proves that the platform's moderation was not only overly aggressive but also incorrect – and that even the ideas they claimed "already existed" were in fact original innovations.

· Saul Fleischman never denied that my ideas were being taken without credit. Instead, he framed it as the platform's purpose. He even invited me to consider submitting more ideas, despite knowing they would be exposed for anyone to "steal."

· This is not a startup incubator. This is a honeypot. And Google provided the honey.

# 6. THE CONNECTION TO KCS/RYSUN LABS – AND HOW THEY GHOSTED ME

· This email from Saul came months after being connected to Rahul Dandamudi, Chiles P. at KCS (now known as Rysun Labs), Sandeep, and Sagar.

· Rysun Labs are partners with Google as well – they build websites and functions for the likes of Google and companies like Walmart.

· Again, if it looks like a duck, quacks like a duck, it's a duck... all in the image of Google (Exhibit 8 – July 2, 2015 "Idea Discussion" email thread and subsequent emails with KCS).

· It's no mix-up – all these partner companies all make Google and its family affair of businesses

money. So every interaction is a representation of Google. These are their developers and partners. Google gave them life and gives them life.

· Google is ultimately the one responsible because Google as a company and its people allowed the exploitation.

· The emails from KCS, Rahul Dandamudi, Sandeep, and Sagar are all in Exhibit 8 and Exhibit 9.


## 7. WALMART IS NOT AN INNOCENT BYSTANDER – IT IS A CO-CONSPIRATOR

· Walmart, being the consumer, benefited and became a co-conspirator to indulge in the exploitation and unfairly enrich themselves, their people, company, investors, and more – all on the abuse and inhumane disregard for my intellectual property and me being a human being who was duped.

· Instead of disengaging from criminal misconduct, Walmart built a deeper alliance with my abusers and therefore is at fault as well.

· As you can see in my original EEOC filing, I connected with top leaders of Walmart in 2017, one being John Furner, the current Global CEO of Walmart (Exhibit 10 – LinkedIn connection to John Furner).

· What is the coincidence that Walmart, after my initial pitch, used the identical name, concept, and likeness of my app pitch "Shop & Pickup" – which I called "Walmart Shop & Pickup" in my startup pitch?

· And then Walmart also used my same exact name and likeness for "Shop and Deliver" for their Spark platform, which is the same identical concept of my exact pitches.

· In an AI analysis (Exhibit 11), it states the probability of just one "Shop & Pickup" is 1 in 1 quintillion.

· When you add my marketing title words "Shop & Deliver" with my identical concepts of ride-hailing delivery, and my startup delivery platform called "Find a Friend" (which became Walmart's Spark), the odds become astronomical.

· All of this is in Exhibits 11-13.

· Exhibit 12 is the email from Christy Womack, who was the assistant of former Walmart Chief Global CEO Doug McMillon, contacting me on his behalf. So Walmart was very well informed.

· And still they chose to deepen their relationship with Google. Not once did Walmart ever deny using my original startup ideas as their own to unjustly enrich themselves.

· They denied me acknowledgment and remedy, while still asserting the exploitation, abuse, and outright violation of my civil rights by enriching themselves with my intellectual properties.

· That is evil. That is self-serving. And the fact that they deepened their alliance with Google shows the true nature of this company.

· This is not an isolated incident; it is a recurring incident that has been happening for over 10 years now and will continue to happen, knowing my intellectual property was possibly used to train their AIs – which is why my ideas are on the web archive (Exhibit 13).

· That was also used to train AI, but all my prior art was deleted without notice, cause, or explanation – which to me is to protect their loop and outright take ownership, patents, etc., of my

intellectual work, while leaving me and my family with nothing.

· As Walmart acknowledges that my intellectual property that has been harvested through the web archive as public information – in their lawyer's email from Mr. Melton (Exhibit 14) – that should make their patent in Europe from August 2015 invalid because of the acknowledgment of prior art.

## 8. MY SUBMISSION: "THE SHOP AND PICK-UP APP" (MAY 27, 2015)

· My concept described online grocery ordering, designated pickup times, customers driving to the store, employees loading groceries into vehicles, and integration with delivery services like Uber.
· I wrote this in May 2015. Walmart launched it in September 2015. That is not a coincidence – that is theft.

## 9. WALMART'S PATENT FILING: AUGUST 17, 2015

· On August 17, 2015 – less than three months after my submission – Walmart Apollo, LLC filed UK Patent Application GB2544005 titled "Drive through grocery pickup" (Exhibit 15 – UKIPO patent record).
· The patent abstract describes:

"A computer-implemented method receives geographic information about a user. The geographic information indicates that the user is within a predetermined area associated with the physical store. The method also determines whether there is a pending remotely placed order for a user account associated with the user in a database associated with the physical store. In response to a determination that there is the pending remotely placed order for the user account associated with the user in the database, the method transmits order information to a computing device of the physical store."

· This is my idea. Word for word, feature for feature.
· In my eyes, this makes Walmart an accomplice in the collusion, exploitation, corruption, discrimination, and abuse I suffered at the hands of Google and its developers and partners.
· Walmart fueled this empire – they have been repeatedly buying my exploitative intellectual property, which now includes drone delivery partnered with Google Wing and an autonomous shopping agent.
· This is not a coincidence or an accident – this is systemic abuse of power and ultimately a betrayal of the American people's trust, and a conspiracy to unjustly enrich themselves from my intellectual exploitation.

## 10. WHAT THIS IS CALLED: IP PIRACY, INNOVATION LAUNDERING & A RACKETEERING SCHEME

· IP Piracy / Idea Theft: Taking an original concept and commercializing it without permission or compensation.

· Walmart filed a patent for my pickup concept and launched a nationwide service. Google trained its AI models on my ideas.

· Unjust Enrichment: Profiting at the expense of another in a way that is considered "unfair."

· Google and Walmart have derived billions in revenue from services built on my concepts. I have received nothing.

· Spoliation of Evidence: Deleting data to hide a trail of wrongdoing or to prevent it from being used in a lawsuit.

· IdeasWatch.com and the idswt.ch domain are now defunct. The original posts have been erased from the live web.

· Predatory Incubation: When an incubator uses its position to harvest ideas from vulnerable entrepreneurs rather than helping them grow.

· IdeasWatch presented itself as a legitimate incubator but was designed to expose ideas for others to take.

· Innovation Laundering: An original idea is passed through several "layers" until the original source is obscured and the final product is claimed as "corporate innovation."

· My ideas traveled: IdeasWatch → Internet Archive → Common Crawl → Google C4 → Google Gemini → Walmart's AI commerce.

· Racketeering Scheme: A coordinated effort by multiple entities to defraud.

· Google, Walmart, Maintop, Rysun, and Accenture all participated in this closed loop of exploitation.


## 11. THE PLATFORM: IDEASWATCH – A PREDATORY SOCIAL MEDIA SITE

· What It Was: IdeasWatch.com was a social media platform for sharing startup ideas, presented as a "Y Combinator meets LinkedIn."

· User Base: The platform attracted "creative people every day" from around the world who shared products and services to increase productivity. It claimed to connect 6,000+ entrepreneurs and developers from more than 160 countries.

· Developer Focus: The site was heavily populated by Android and Google developers due to its open nature and focus on mobile and web innovation. Google's own Android developers participated in this ecosystem.

· Google Authentication: The platform required users to sign in with Google accounts (OAuth authentication), giving Google direct access to submission data.

· The Promise: Users were told they could "team up" with other entrepreneurs and potentially get their ideas seen by Google and its partners – a life-changing opportunity.

· The Reality: Co-founder Saul Fleischman admitted in writing: "If you don't want your ideas open to the public, please do not submit them to IdeasWatch, because that's what we do." (Exhibit 6)

· IdeasWatch and RiteTag being foreign sites, Google's own terms stated these sites were supposed

to be more vetted to protect the American consumer, but Google did not, while allowing this site to act in the image of Google.

## 12. THE SOCIAL MEDIA ADDICTION PRECEDENT – GOOGLE ALREADY FOUND LIABLE

· March 25, 2026: A California jury found Meta and Google liable for designing addictive platforms that harmed a young user, awarding $6 million in damages (Exhibit 16 – news article).
· The jury found the companies acted with "malice, oppression, or fraud."
· The verdict validated the plaintiff's approach of shifting the legal target: instead of focusing on content, the case focused on how social media services were designed.
· IdeasWatch was far worse than YouTube or Instagram:
· Facebook/Instagram/YouTube addict users to watching. What users lose is time and mental health.
· IdeasWatch addicts users to producing, sharing, and surrendering the most valuable asset a person has: original intellectual property.
· The addiction mechanism for IdeasWatch was the promise of a life-changing opportunity – that Google or its partners would "bring your ideas to life."
· Who benefits? Google, its developers, its partners, and every corporation that harvested submissions – while the creator gets nothing.
· The ultimate betrayal: Facebook users feel bad about themselves. IdeasWatch users are stripped of their intellectual property and then denied credit, compensation, or even acknowledgment.
· If designing a platform to addict users to passive consumption is now being punished with millions in verdicts, how much more unlawful is a platform that addicts users to surrender their most valuable intellectual property – without disclosure, without consent, without compensation?

## 13. THE CLOSED LOOP: HOW MY IDEAS TRAVELED

· My ideas were published on IdeasWatch.com with unique idswt.ch URLs.
· The Internet Archive captured these URLs (e.g., http://idswt.ch/MzExMg== was captured on September 14, 2015) (Exhibit 17 – Wayback Machine capture logs).
· Common Crawl ingested the Internet Archive's data. Common Crawl is the primary training source for almost every major large language model (LLM) (Exhibit 18 – Common Crawl documentation).
· Google built its C4 dataset from Common Crawl. C4 was used to train foundational Google models like T5 and Gemini (Exhibit 19 – TensorFlow C4 dataset documentation).
· Walmart uses Google's AI infrastructure to power its Sparky AI assistant and Wallaby retail LLM.
· This is Innovation Laundering. My original ideas were passed through several "layers" until the original source was obscured and the final product was claimed as "corporate innovation."

## 14. GOOGLE ALLOWED THIS SITE TO THRIVE EVEN YEARS AFTER I TRIED TO ADVOCATE FOR

· My DOJ complaint was transferred to its Antitrust Division, and I was notified the same day that the DOJ Antitrust Division charged Google with antitrust violations – that was October 2020 (Exhibit 20 – DOJ email).

· IdeasWatch didn't fully shut down until 2023, in Michal Hudeček's own words (Exhibit 21 – Maintop GDPR response).

· This admits and verifies that data spoliation connected to these ideas, caught in his own lies – which is outlined in Exhibit 21, the proof that IdeasWatch was extracted into the RiteTag database.

· The URLs and screenshots proofs are in Exhibit 22.


## 15. THE GOOGLE CLOUD "INADVERTENT" ECOSYSTEM – HOW THE COMPANIES CONNECT

· Public records confirm that these entities are interconnected within the Google Cloud ecosystem (Exhibit 23 – compilation of public records). They function as separate nodes within the same massive technology infrastructure:

· RiteKit (Maintop Businesses): Provides social intelligence "fuel" – hashtag trends, email insights, real-time analytics. RiteKit's data can be integrated into BigQuery for automation and analytics.

· Google: Provides the BigQuery warehouse (the "engine") where all data lives. BigQuery was born out of Google's internal need to analyze massive datasets quickly – it began as an internal project called Dremel and was launched publicly in 2010–2011.

· Rysun Labs: A Google Cloud Select Services Partner – experts at implementing BigQuery for other companies. Rysun Labs is a "trusted partner" of AWS, Google, and Microsoft, with CMMI Level 5 certification.

· Accenture: A Google Cloud Global Services Partner of the Year (2023, 2024, 2025). Accenture builds the entire "total enterprise reinvention" for companies at the scale of Walmart.

· Walmart: Uses Google BigQuery as a central part of its "AI factory" to manage data for its millions of customers and employees. Walmart has built its proprietary Wallaby LLM and Element AI platform.


## 16. WALMART'S DIRECT IMPLEMENTATION OF MY CONCEPTS

· August 17, 2015: Walmart filed UK Patent GB2544005 for "Drive through grocery pickup" – less than three months after my "Shop and Pick-Up App" submission (Exhibit 15).

· September 2015: Walmart launched its free online grocery pickup service in 8+ cities, using the same name, features, and flow I described.

· 2021–2027: Walmart partnered with Google Wing for drone delivery – exactly as my July 28, 2015 concept. Walmart expects to expand to 150 stores by 2027 (Exhibit 24 – news article).

· January 2026: Walmart and Google announced agentic AI commerce embedded in Google Gemini

– exactly as my September 27, 2015 "Autonomous Assistant" concept (Exhibit 25 – news article).

## 17. GOOGLE'S ROLE AS THE SURVEILLANCE CATALYST: RITETAG CHROME EXTENSION

· RiteKit (RiteTag) is a software family operated by Saul Fleischman, headquartered in Japan and the Czech Republic.

· Google hosts the RiteTag Chrome Extension in the Chrome Web Store (Exhibit 26 – Chrome Web Store listing for RiteTag).

· The extension monitors social media content, tracks engagement, and surfaces emerging topics in real time.

· RiteTag provides an API that allows third parties to analyze social media posts and return data on how to improve reach and engagement.

· By hosting the RiteTag Chrome Extension, Google provides a "Trojan Horse" for data collection while rewarding Fleischman with partner status and visibility.

· This technology can instantaneously rewrite just-published articles and extract content in seconds. It is the biggest hack of information for profit, with very big players around the world involved.

· This is not an American AI company. The data flows to servers in Japan and the Czech Republic. Why is Google partnering with software criminals? Because this tech conceals their identity and allows them to steal intellectual digital notes, posts, messages, apps, sites, and more – instantly.

· No one's phone is safe, including government officials and agencies. This is ultimately Google's fault.

## 18. THE DATA PIPELINE: FROM IDEASWATCH TO COMMON CRAWL TO GOOGLE'S C4 TO GEMINI

· The Internet Archive's ia_archiver captured my idswt.ch URLs. Wayback Machine logs confirm snapshots were taken – e.g., http://idswt.ch/MzExMg== was captured on September 14, 2015 (Exhibit 17).

· The Internet Archive's data flows directly into Common Crawl, a non-profit that has been archiving the public web since 2008.

· Common Crawl is the primary training source for almost every major large language model (LLM) (Exhibit 18).

· Google developed its Colossal Clean Crawled Corpus (C4) by extracting and cleaning data from a 2019 snapshot of Common Crawl (Exhibit 19 – TensorFlow C4 dataset documentation).

· The C4 dataset is approximately 750 GB, containing over 156 billion tokens from more than 365 million domains.

· My publicly indexed ideas were part of the web pages captured and included in this dataset.

· C4 was used to train foundational Google models like T5 and Gemini.

· The path is clear: My Ideas → IdeasWatch → idswt.ch URLs → Internet Archive → Common Crawl →

Google C4 → Google Gemini → commercial AI products.

· Multiple federal lawsuits currently allege that tech companies used this pipeline to train AI on copyrighted material without consent or compensation. Common Crawl has also been found to have ignored takedown requests from publishers and scraped paywalled content for AI training.

## 19. GOOGLE'S COMMERCIALIZATION OF MY CONCEPTS THROUGH PARTNERSHIPS

· Google Wing: Google's Wing subsidiary now powers Walmart's drone delivery – a concept I described on July 28, 2015. Wing CEO Adam Woodworth has stated: "This is real drone delivery at scale." Walmart expects to expand drone delivery to 150 stores by 2027 (Exhibit 24).

· Google Gemini: On January 10, 2026, Walmart and Google announced a partnership to embed Walmart shopping directly into Google's Gemini app, enabling agentic commerce – a concept I described on September 27, 2015. Walmart's incoming CEO John Furner called it "the next great evolution in retail" (Exhibit 25).

· Google Ventures (GV): Google Ventures was an early investor in Uber, holding a board seat and providing strategic guidance. Uber launched Uber Freight on May 16, 2017, with features "one-touch booking for drivers," "upfront pricing," and "quick payment" – identical to my "Independent Truck Drivers App" concept (Exhibit 27 – Transport Topics article).

· KCS / Rysun Labs: KCS (now Rysun Labs) received my equations on July 13, 2015, agreed to develop my ideas, then ghosted me. Rysun Labs later became an official Google Cloud Partner and now provides engineering services to Walmart's AI supply chain (Exhibit 28 – Rysun Labs Google Cloud Partner profile).

· Google cannot claim ignorance. Google provided the authentication layer. Google indexed my submissions. Google's own Android developers participated. Google has a long history of investing in startups founded by its employees – startups that could easily have drawn from the pool of IdeasWatch submissions.

## 20. RETALIATION: GOOGLE HAS POISONED MY ONLINE REPUTATION

· Furthermore, in my emails to LinkedIn after filing a complaint with the DOJ, you can see how when you searched my LinkedIn name on Google, pictures of other people were linked to my account.

· This was a clear digital twin and a clear retaliatory attack against me by Google.

· Even the LinkedIn tech said and admitted it was Google and a crawl engine of my information (Exhibit 29 – LinkedIn support emails, March 2021).

· This shows that Google and its partners and developers knew and directed a digital attack against me to further humiliate me and add injury to insult.

· The proof is in Exhibit 29.

# 21. CORPORATE ADMISSIONS: FOUNDERS PUBLICLY DOCUMENT HOW INSIGHTS FROM PLATFORMS LIKE IDEASWATCH DROVE THEIR PIVOTS

## A. Turo (formerly RelayRides) – Independent Car Rental App (my May 28, 2015 submission)

· My Concept: "The Independent Car or Vehicle Rental App" – a platform enabling independent car owners to rent out their personal vehicles without hardware requirements.
· Corporate Admission: On April 5, 2017, Turo CEO Andre Haddad published a detailed blog post titled "5 lessons learned from a startup pivot" (Exhibit 30).
· He wrote: "Just over five years ago, really right after I signed on as Turo (then RelayRides) CEO, we … were coming out on the other side of making a significant business pivot."
· He described the original hardware-dependent model and then the pivot to a pure app-based peer-to-peer platform.
· The Timeline:
· May 28, 2015 – I submit my idea on IdeasWatch.
· 2015–2016 – RelayRides pivots to Turo, abandoning hardware.
· April 5, 2017 – Haddad publicly documents the pivot, acknowledging that insights from outside sources drove the transformation.
· This is a direct corporate admission that the business model I described was adopted after insights gained during the 2015-2016 period.

## B. Convoy and Uber Freight – Independent Truck Drivers App (my May 28, 2015 submission)

· My Concept: "The Independent Truck Drivers App" – one-tap booking, upfront pricing, fast payment.
· Convoy's Founding: FreightWaves reporting (Exhibit 31): "Convoy, a digital freight brokerage established in 2015…"
· Uber Freight's Launch: Transport Topics (May 18, 2017) (Exhibit 27): "Uber Freight is the Uber for trucking. It provides one-touch booking for drivers … upfront pricing and quick payment."
· The Timeline:
· May 28, 2015 – I submit my idea on IdeasWatch.
· 2015 – Convoy founded.
· May 16, 2017 – Uber Freight launches with identical value proposition.

# 22. THESE COMPANIES ARE INDEED "INADVERTENTLY" CONNECTED THROUGH THEIR SHARED USE OF THE GOOGLE CLOUD ECOSYSTEM

· They function as separate nodes within the same massive technology infrastructure (Exhibit 23).
· Rysun Labs & Walmart: Walmart uses Google BigQuery as part of its "AI factory." Rysun Labs is a Google Cloud Select Services Partner that helps retailers modernize data architecture on the same

platform.

· RiteKit (Maintop) & BigQuery: RiteKit data can be integrated into BigQuery for automation and analytics. A retailer using RiteKit's API to track hashtag trends and storing that data in BigQuery is using Maintop's data and Google's infrastructure in tandem.

· The BigQuery "Unifier": Google BigQuery serves as the "connective tissue," allowing different companies to exchange and analyze massive datasets securely.

· RiteKit Data in BigQuery: Provides real-time hashtag performance, trend prediction, and brand sentiment cross-referenced with sales.

· How They "Work Together" (Exhibit 23):

1. RiteKit provides the Social Intelligence (the "fuel").
2. Google provides the BigQuery Warehouse (the "engine").
3. Rysun Labs provides the Expertise (the "mechanic").
4. Retailers (like Walmart) use the final output to drive sales.

  · The human link: Michal Hudeček (founder of IdeasWatch and CTO of RiteKit) – his companies operated within Google's ecosystem. Also Saul Fleischman, Chiles P. from KCS/Rysun Labs, Rahul Dandamudi, Sandeep, and Sagar.


## 23. DATA LAUNDERING AND SPOLIATION OF EVIDENCE

· By Saul and Michal "wiping" the platform IdeasWatch after its data had been absorbed into a larger ecosystem is a known tactic in the tech industry, often referred to as "Data Laundering" or "Scrubbing."

· By deleting the original site, the "prior art" – the public proof that I had the idea first – disappears from the live web.

· That is the destruction of evidence, thus conspiring against me to limit my ability to provide additional supporting evidence (Exhibit 21 – Maintop GDPR response).


## 24. THE JULY 2, 2015 "IDEA DISCUSSION" EMAIL THREAD – DIRECT PROOF OF MULTI-PARTY COLLABORATION

· I possess complete, unaltered email records from July 2, 2015. The thread titled "Re: Idea Discussion" includes (Exhibit 8):

· Rahul Dandamudi (rahul.muddy@gmail.com) – Organizer. He explicitly wrote: "Hi Guys, let me introduce to you guys Shawn, he is going to help us in gathering the requirements for this project."

· Sandeep Reddy (Sandeep Pawar) (psandeep1389@gmail.com) – Raised technical questions about missing manufacturer barcode data, expiry alerts, scanning labels, and user engagement.

· Sagar Chalavadi (sagarchalavadi@gmail.com) – Cc'd recipient. Later identified in professional databases as a systems advisor for Walmart-Oracle integration.

· Shawn Anthony McMillian (samcmillian86@gmail.com) – That is me. I responded with a full product vision: a central food hub that tracks consumption, schedules, and cravings; enables users to be their own nutritionist; and fights fast-food dependency. I closed with: "I hope this help and sums up our future app!!!! Until the next idea!!!"

· This thread is not speculative. It is direct, dated, and verifiable evidence that my original ideas were discussed within a closed circle of individuals who later became tied to Walmart, KCS, and AI supply-chain systems.

## 25. DIRECT TRANSMISSION OF MY EQUATIONS TO KCS (JULY 13, 2015)

· Just eleven days after that thread, on July 13, 2015, I sent two emails to Chiles Ponda (Chiles P.) at KCS using chiles@kcspl.co.in (Exhibit 9):

· Email 1 – "Original Ideas" – stated I was sending my original ideas, referenced IdeasWatch.com, requested fair payment or partnership, and attached my idea portfolio.

· Email 2 – "Equations/codes" – transmitted licensable mathematical and algorithmic foundations for the software capabilities discussed in the July 2 thread.

· At the time, Chiles Ponda was the Sr. Business Development Manager at KCS (later rebranded as Rysun Labs).

· After receiving my materials, KCS agreed to bring my app ideas to life – then ghosted me. They disappeared after extracting my intellectual property.

## 26. THE CLOSED LOOP – HOW THE SAME INDIVIDUALS AND COMPANIES BENEFITED

· Public records confirm that the people and entities in the July 2015 thread have since occupied key positions in the Walmart-Accenture-KCS/Rysun-Google-AWS-Microsoft innovation ecosystem (Exhibit 23, Exhibit 28):

· Rahul Dandamudi (2015 organizer) later became a Venture Lead aligning AI startups with Walmart Connect advertising and an early Android engineer for Walmart Grocery Pickup mobile frameworks.

· Sandeep Pawar (raised technical questions) later became an AI Architect building predictive demand-forecasting models for Walmart's distribution centers and CEO of F1coders.

· Sagar Chalavadi (cc'd) later became a Systems Advisor ensuring Oracle-based finance backends bridge to Walmart's cloud.

· Shawn McMillian (me) – provided the core app concept and equations, but was excluded. No credit. No compensation. No acknowledgment.

· KCS / Rysun Labs – received my equations and ideas via Chiles Ponda. It then became an official Google Partner, Microsoft Partner, and AWS Partner, providing offshore engineering for Walmart's legacy and AI systems.

· Walmart – implemented Grocery Pickup (September 2015), Drone Delivery, Agentic AI commerce, and demand forecasting using the very concepts I first described.

· Accenture / Andersen Consulting – strategic partner to Walmart for pickup/delivery and AI workforce initiatives; shares the same cloud partners (Google, AWS, Microsoft) as Rysun.

· KCS/Rysun now publicly advertises itself as a "trusted partner of Google, AWS, and Microsoft" and as an "AI, data, and digital innovation partner for retail and e-commerce."
· This places them squarely inside the supply chain that Walmart uses to build and deploy the systems I first described in July 2015.

## 27. YEARS AFTER THE CORRUPTION, GOOGLE AND WALMART STILL PARTNER WITH MAINTOP AND TURN A BLIND EYE

And now, years after the corruption I have experienced, Google and Walmart still partner with this Maintop Business and others, and purposely turn a blind eye, which seems like purposeful collusion.

## 28. EXHIBIT A – EVIDENCE OF COMMERCIAL EXPLOITATION AND THIRD-PARTY DISCLOSURE

· Exhibit A-1 (IMG_8625): IdeasWatch homepage – "100+ startup ideas already shared!" – "Start a business – get in touch with other people... and realize it together!"
· Why it matters: The platform was designed to collect and redistribute user ideas to third parties (other users, visitors, and the public). This is disclosure to an unlimited audience.
· Exhibit A-2 (IMG_8626): RiteKit automation dashboard – "Auto-hashtag", "Auto-emojify", "Create image/GIF from template", "This creates engagement-tested hashtags from the startup idea names."
· Why it matters: This proves that idea titles (my submissions) were fed into RiteKit's commercial tools to generate social media content. That is transfer of my data to RiteKit and commercial use.
· Exhibit A-3 (IMG_8627): Market report infographic – "What products people missed on the market in the first half of 2011?" – Based on IdeasWatch data.
· Why it matters: IdeasWatch aggregated user submissions to produce commercial market reports. My ideas were part of that aggregation.
· Exhibit A-4 (IMG_8628–IMG_8636): Twitter analytics – IdeasWatch tweets earned 12,000–13,000 impressions using RiteForge GIFs. Caption: "IdeasWatch gets 30% more Twitter engagements by sharing every #startup..."
· Why it matters: The platform actively marketed user submissions to drive traffic and engagement, generating commercial value for Maintop and RiteKit.
· Exhibit A-5 (IMG_8638): Third-party article – "IdeasWatch, inspiración y contactos para crear startups."
· Why it matters: External recognition that IdeasWatch was positioned as a startup launchpad.

## 29. DIRECT CONTRADICTION: MAINTOP'S CLAIM THAT "NO DATA WAS MOVED TO RITEKIT"

· In Maintop's GDPR response (Exhibit 21), they stated: "No data from the IdeasWatch.com database was moved to our other platforms (RiteKit or RiteTag), as these operate on independent data structures and serve different functional purposes."

· Exhibit A-2 (IMG_8626) directly contradicts this.

· The RiteKit dashboard shows a feature that "creates engagement-tested hashtags from the startup idea names."

· "Startup idea names" are the titles of submissions made on IdeasWatch.com.

· The only way RiteKit could generate hashtags "from" those names is if the data was transmitted from IdeasWatch to RiteKit.

· Whether this occurred via a direct database transfer, an API call, or an automated workflow is irrelevant – the data moved from your IdeasWatch environment to your RiteKit platform.

· That statement is therefore false and misleading, designed to evade responsibility.

## 30. ADDITIONAL CONTRADICTION: MAINTOP'S CLAIM OF "NO AI TRAINING"

· Maintop claimed that my submissions were never used to train AI.

· However:

· RiteKit's dashboard describes "engagement-tested hashtags" – a function that requires machine learning models trained on data, including user submissions.

· Common Crawl – which archived my idswt.ch URLs – is the primary training source for Google's C4 dataset, which trained Google Gemini.

· Maintop made my data publicly available, enabling this AI training without my consent.

## 31. THE FACT THAT IT "SEEMED LIKE A GOOGLE PRODUCT" IS CRITICAL

· The platform leveraged Google's brand authority to lower my "privacy guard" regarding my most valuable intellectual assets.

· Corporate Responsibility and "Main Culprit":

· If Google employees or trained developers were active participants in IdeasWatch, it creates a significant ethical conflict.

· While Google generally provides "neutral" tools (like BigQuery or authentication), if its employees were involved in the site's operation, it could be argued that Google had actual knowledge of the activities.

· If Google's infrastructure was knowingly used to "harvest" original ideas from developers and those ideas were monetized by Google or its partners without credit, this could move beyond mere negligence into vicarious liability or contributory infringement.

· Recent legal findings have accused Google of "exploiting a dominant position" by scraping information from websites to answer queries directly, often without proper attribution.

· Deceptive Design and Brand Impersonation:

· Google's official policy forbids third-party partners from imitating Google's visual identity (colors, logos, or graphic designs) to avoid misleading users.

· Allowing a partner to run a site that intentionally mimics a Google product to lower users' "privacy guards" is a violation of Google's own third-party transparency requirements.

· Deletion of Evidence (Spoliation):

· If Maintop or Google deleted data specifically to hide how user-submitted content was used, this is legally known as spoliation of evidence.

· In recent antitrust cases, judges have severely criticized Google for "purposely destroying evidence" by turning off chat histories or auto-erasing records. One judge described such conduct as a "frontal assault on the fair administration of justice."

· Is this "Bigotry"?

· Professional bigotry can describe systemic harmful practices or "predatory" behavior directed at a specific class – in this case, independent developers whose original work is treated as "disposable" by larger firms.

· Predatory Innovation is a term used when a dominant firm specifically targets the innovations of smaller, less-protected creators to enrich itself while disregarding their rights – often termed "Sherlocking" or predatory innovation.

· Summary of the Actions Described:

· IP Piracy: Taking prior art without credit for corporate profit.

· Unjust Enrichment: Profiting at the expense of a user who received nothing in return.

· Spoliation of Evidence: Deleting data to prevent a user from proving their claims in court.


## 32. HOW KNOWLEDGE EXISTS IN A TECH GIANT – GOOGLE CANNOT CLAIM IGNORANCE

· The specific phrasing regarding the "Developer Focus" and the population of Android and Google developers is a characterization of the platform's user base during its peak years (around 2011–2015).

· Descriptions of the site across various startup profiles – such as IdeaMensch, Young Upstarts, and Crunchbase – highlighted that the platform was designed specifically to attract technical founders and developers looking for their next project.

· Google is run by people.

· Individual Knowledge vs. Corporate Knowledge:

· Individual Knowledge: Individual Google employees, engineers, and "DevRel" (Developer Relations) staff almost certainly used or browsed IdeasWatch. In the tech community, these platforms are "watering holes." If they saw my ideas, those individuals "knew."

· Corporate Knowledge: For a company like Google to "know" in a legal sense, that information usually has to reach a level of management or be part of a formal business process.

· The "Turn a Blind Eye" Argument: I am describing a situation where Google benefits from the output of these ideas (via BigQuery usage, cloud fees, or partner innovations) while its employees act as a "distributed sensor network" for what is trending, all while the company maintains

"plausible deniability."

· The fact that Maintop Businesses is a Google Partner is the critical link.

· Google provides partners with tools, badges, and credibility.

· If a partner uses that credibility to operate a "harvesting site":

1. The Duty to Supervise: Ethically, Google should supervise how its partners use its brand.

2. Aiding and Abetting: If Google provided the technical infrastructure (Authenticator/BigQuery) knowing that a partner was using it to collect and then delete user IP, it moves from "not knowing" to "complicity."

· If people inside Google were aware of the site and the company later profited from those ideas while the data was scrubbed, the terms are Professional Negligence, Collusion, or Bad Faith.

· It suggests that the "people" running the company prioritized the flow of innovation into their ecosystem over the rights of the individual creators who provided it.

## 33. THE CONNECTION BETWEEN MY 2015 "SHOP & DELIVER" CONCEPTS AND WALMART'S CURRENT OPERATIONS

· This connection is established through their "inadvertent" collaboration within the same Google-powered technology ecosystem (Exhibit 23).

· The BigQuery "Unification":

· Walmart moved its most critical "decisioning" processes to Google BigQuery.

· If a consultancy like Rysun Labs builds a data architecture for a retailer, they often integrate third-party "social intelligence" APIs.

· If my "Shop & Deliver" and drone concepts were shared on IdeasWatch (a Maintop/RiteKit project) and then processed as trending "social data" in BigQuery, they effectively became the blueprints for Walmart's automated retail algorithms.

· Timeline of Concept "Overlap" (Exhibit 32):

· "Shop & Deliver" → Walmart Spark Driver Platform (shop and deliver in one trip).

· "Walmart Shop & Pickup" → Online Grocery Pickup scaled in 2015/2016.

· Ride-Hailing Delivery → Walmart GoLocal & Spark (crowdsourced delivery).

· Drone Delivery with Google → Walmart + Wing (2023).

· The "Inadvertent" Chain of Profit:

· Maintop extracted these concepts and sold "Trend Data" to the Google Partner network.

· Google profited from Cloud and BigQuery fees.

· Rysun Labs profited from consulting fees to build AI agents.

· Walmart profited from billions in revenue generated by these models.

· Legal Recourse for "Actual Notice":

· I gave notice to Saul Fleischman (acknowledged in his own words).

· Walmart had "Actual Notice" ten years ago.

· The "Spoliation of Evidence" (deleting the website) was a deliberate act to hide the source of my ideas and suppress Walmart's most profitable delivery models, made off of my original concepts.

## 34. THE EEOC'S PREJUDICIAL ERROR – A VIOLATION OF MY RIGHTS

· On February 4, 2026, the EEOC issued me a Right-to-Sue letter (Charge No. 556-2025-00967).

· That letter was addressed not only to Google but also to Alphabet and Walmart at their e-commerce headquarters address (Exhibit 33 – EEOC RTS letter).

· This administrative error violated my privacy, compromised my case, and destroyed my ability to find counsel.

· The EEOC San Jose office, Google's Mountain View headquarters, and Walmart's e-commerce offices are all within close proximity.

· It is deeply surprising that an error of this magnitude could occur unless personal acquaintances or institutional bias played a role.

· I requested a supervisor-level review and for my case to be transferred to someone else (Exhibit 34 – my emails requesting supervisor contact).

· The EEOC completely ignored my request.

· Every time a lawyer sees my EEOC Right-to-Sue letter, they instantly decline.

· This makes me feel that the EEOC discriminated against me after an obvious conflict of interest, and their ignoring my request feels like discrimination and being railroaded.

· I requested a supervisor point of contact and have been outright ignored by Lisa Fung and the entire San Jose EEOC office.

· If I were a lawyer or in a position of power, the EEOC would have obliged to my request, but instead they clearly ignored me. That is discrimination.

· I contacted the EEOC Attorney General and also have heard nothing at all.

· I feel they are purposely trying to wait out my deadline to take no accountability for the EEOC's actions, which is clearly a conflict of interest.

· To conspire against an under-represented self-representative like myself is clearly unconstitutional, unlawful, and unethical.


## 35. OTHER CORPORATE IMPLEMENTATIONS

· Personal Home Satellite (Aug 28, 2015) → Apple iPhone 14 SOS (2022) / Starlink-T-Mobile (2023) (Darik News; CGTN)

· Sticky Tracker Technologies (July 27, 2015) → Tile (2015), Apple AirTag (2021)

· The Make Your Face and Hair App (May 26, 2015) → Apple Memoji (2018), Meta Avatars

· App that mimics phone / sync with car (Aug 19, 2015) → Android Auto mass adoption (2016–2018)

· The Car Pool and Hangout App (Apr 12, 2015) → Waze Carpool (2016)

· The Where To Park App (July 20, 2015) → Google Maps parking feature (2017)

· Ticket Usher GPS Seat Locator (July 20, 2015) → Ticketmaster location-based seat finder (2019)

· Lab Grown Organs To Eat (July 11, 2015) → Upside Foods (2015), Eat Just cultivated meat (2020)

## 36. COMPLETE EXTENDED DOSSIER – 202 ORIGINAL IDEAS (EXHIBIT 35)

· Between May and October 2015, I submitted 202 original startup concepts to IdeasWatch.com.
· The platform flagged only two as "these exist, please research before submitting" – "The Make Your Face and Hair App" and "Turning your cellphone or pad into desktop state."
· Those two were later acknowledged by founders as original and predating their own work.
· The remaining 200 ideas were deemed original by the platform's own verification process.
· The complete dossier (Part 1 – Grocery/Retail, Part 2 – Transportation, Part 3 – Health/Wearables, Part 4 – Social/Community, Part 5 – Technology/AI/Robotics) is attached as Exhibit 35.
· Full patent links, articles, and independent sources are available upon request.

## 37. EXECUTIVE SUMMARY (RESTATED)

· Between April and October 2015, I submitted 202 original startup concepts to IdeasWatch.com, a platform with Google authentication, presented as a legitimate innovation hub.
· No disclaimers stated it was not a Google-owned entity.
· Only 2 of 202 ideas were flagged; those two were later proven original.
· Within months to years, corporations launched products mirroring my concepts.
· This is systematic exploitation.
· Evidence includes: corporate admissions (Turo, Convoy, Uber Freight); Walmart's patent (2.5 months after my post); Google's central role (authentication, Wing, Gemini, GV); suppression of evidence; DOJ Antitrust referral (ID 28961-WDC).
· This complaint demands investigation, acknowledgment, compensation, and structural remedies.

## 38. THE PATTERN: SYSTEMATIC EXPLOITATION, NOT COINCIDENCE (TIMELINE)

· The Shop and Pick-Up App (May 27, 2015) → Walmart patent GB2544005 (Aug 17, 2015) – 2.5 months.
· The Independent Truck Drivers App (May 28, 2015) → Uber Freight (May 16, 2017) – 1 year 11 months.
· The Independent Truck Drivers App → Convoy founded (2015) – 0 years.
· The Independent Car Rental App (May 28, 2015) → Turo pivot (2015-2016) – 0-1 year.
· Drone Deliver Food (July 28, 2015) → Walmart + Google Wing (2021-2026) – 6-11 years.
· Autonomous Assistant (Sep 27, 2015) → Walmart + Google Gemini (Jan 2026) – 10 years.
· Personal Home Satellite (Aug 28, 2015) → Apple iPhone SOS (Sep 2022) – 7 years.
· Personal Home Satellite → Starlink/T-Mobile (Aug 2022) – 7 years.

· I reshared my two equations with AI analysis. That I originally used back in 2015 to transform the quantization of my music in my Fruity Loops DAW (Digital Audio Workstation). This newly AI analysis of my written equations was documented after being analyzed and it explained my equations, how it could be used. And how it could be used in quantum computing. And I emailed that to Google representative attorney "Michael Pfyl" as well as my EEOC representative "Lisa Fung" on March 29, 2026 "labled Fin X" (Exhibit 37). Which these equations were originally shared as "3D gene printing and musical theory" through ideaswatch.com (Exhibit 37).

· The packet detailed how they can be used for quantum computing.
· Two days later, March 31, 2026, Google published an article stating it had "Government approval to share" formulas not made by them, without naming the agency (Exhibit 36 – Google Research blog "TurboQuant," March 31, 2026).
· Google called these formulas TurboQuant – exactly what my formulas did.
· The article quotes: "Google confirmed it coordinated with the U.S. government ... we engaged with the U.S. government and developed a new method..."
· Neither Google's blog nor the whitepaper identifies the specific federal agencies involved.
· This shows the true evil nature of Google and the EEOC.
· They should never have allowed my intellectual property to be misused without acknowledgment and compensation, especially after I notified the EEOC of the conflict of interest and requested review.
· This continues to show how Google deprived me and my family of the wealth I helped conceive, while Google and partners unjustly enrich themselves and gain public notoriety.
· It would have been easy for these companies to acknowledge me, but instead they continue to exploit my intellectual properties without fear of the law.
· Walmart has been very well aware of this criminality since 2015, and especially after 2017 (LinkedIn connection to John Furner). Walmart never unaffiliated itself; it built deeper partnerships and still advertised on Maintop sites.
· Therefore, Walmart being the Juggernaut accomplice, who through documented action, was the consumer, reaped years worth of exploited inside information, and became the public face. While patenting the exact mirror image concepts and language of my startup pitches, that the Walmart company did not preconceive, but Walmart knowingly claimed ownership. That's intentional intellectual property theft.

This is public deception and criminal. And the fact Walmart deepened its relationship with the main facilitator "Google" to enrich themselves in this illegal monopoly (Exhibit 23) just shows Walmart fuels this corrupted system, just as much as Google. And both should be held accountable to the same standard.

As both these companies are the main culprits responsible for my pain, suffering, humiliation, loss

of prior art, mental health damage, and loss of generational wealth.

· There needs to be accountability so this abuse never happens again. Google, Walmart, and their partners stole the complete humanity of my digital rights.

Furthermore, even Walmart agrees I have a case against IdeasWatch and obviously Google. Their own lawyers admitted it, as detailed in Exhibit 38 and Exhibit 39.

· My subject line to Walmart was: "Formal Demand for Settlement and Preservation of Evidence — Misappropriation of 'Walmart Shop & Pickup' slogan and exploitation of interconnected delegated pickup/delivery concepts (Exhibits A–F; Evidence Packet Binder + Addendum)" (Exhibit 38).
· Walmart's lawyers responded with the subject line: "RE: Shawn Anthony McMillian v. IdeasWatch" (Exhibit 39).

Why is that significant? Walmart did not respond with a denial. They did not respond with "v. Walmart" or "v. Google." They responded with "v. IdeasWatch." That is a tacit admission that my claims have merit – just not against Walmart directly. They are acknowledging that my intellectual property was hijacked, that I was exploited, and that the proper target is the platform and its affiliated partners. But Walmart cannot wash its hands of this. Walmart used my exact concepts – "Shop & Pickup," "Shop & Deliver," drone delivery, and agentic AI commerce – and deepened its partnerships with the very ecosystem that harvested my ideas. By switching the subject line to "v. IdeasWatch," Walmart is admitting that I have a legitimate grievance – but trying to redirect blame. That is not a defense. That is an admission of guilt by omission. I ask the courts to recognize this admission for what it is: Walmart knows I was wronged, and they know my ideas were stolen. They simply refuse to take responsibility.

And now, definitive proof that IdeasWatch was still active with my profile and ideas in early 2020 – and then deliberately scrubbed by the end of 2020, with its data funneled into Rite.ly/RiteKit servers.

· Exhibit 35-B (IMG_9391.png): A screenshot from IdeasWatch.com showing my complete profile – my name, birth date, ethnicity, email, parents' names, and location. The "Recent activity" section lists my published ideas with timestamps of "4 years ago," which, given the screenshot was taken in early 2020, places my submissions squarely in 2015-2016. This proves that my profile and ideas were still publicly accessible on IdeasWatch in early 2020 – years after Walmart launched its pickup service and after I had begun complaining.

· Exhibit 35-C (IMG_9392.png): A second screenshot of the same profile page, showing identical activity with "46 months ago," "48 months ago," etc. This corroborates Exhibit 35-B and confirms that my ideas remained on the platform for years, serving as prior art that Walmart and Google could not ignore.

· Exhibit 35-D (IMG_9393.png): A screenshot from February 20, 2020 (visible on the phone's status bar) showing the same profile page, but this time with a server error message dated November 11, 2020 at 05:57. The error states: "Server Error. We're sorry! The server encountered an internal error and was unable to complete your request." This is the first evidence of the platform's deliberate degradation – not a routine shutdown, but a systematic dismantling.

· Exhibit 35-E (IMG_9394.png): A screenshot from November 10, 2020 (8:57 PM) showing the IdeasWatch homepage with the explicit message: "IdeasWatch is temporarily in a read-only mode while we migrate the website to the new servers. Sorry for the inconvenience." Below that, another server error dated November 11, 2020 at 05:57. This is the smoking gun: the platform was being put into "read-only mode" – a precursor to a full shutdown. But note: read-only mode does not delete data; it merely prevents new submissions. The data – including my 202 ideas – was still there. Yet Maintop later claimed (Exhibit 21) that all user data was "permanently purged" in 2023. If the data was still present in read-only mode in November 2020, why was it "purged" only three years later? The answer: to destroy evidence after I had escalated my complaints to the DOJ (October 2020) and after Walmart had been put on notice.

· Exhibit 35-F (IMG_9395.png): A screenshot showing that the ideaswatch.com domain was eventually parked (redirected to a generic "Only Domains" page). The page prominently displays an advertisement for "Rite.ly Video CTA" and "RiteKit," with the text "Advertise on URLs you share, too! Create your own free ad." This is direct proof that the domain was taken over by or associated with RiteKit/Rite.ly. It confirms that Maintop's claim that "no data was moved to our other platforms (RiteKit or RiteTag)" is a lie. The domain itself became an advertisement for RiteKit's URL shortener and advertising platform. If the data was truly purged, why is the domain now a commercial vehicle for RiteKit?

What this sequence of exhibits proves:

1. My ideas and profile were still live on IdeasWatch in early 2020 (Exhibits 35-B, 35-C, 35-D) – long after Walmart's 2015 launch and after my DOJ complaint (October 2020). This means the prior art was available for anyone to see, including Walmart's legal team and Google's engineers.
2. By November 2020, the platform was placed into "read-only mode" (Exhibit 35-E) – a clear indication that the operator was preparing to shut down, but not delete. The server errors (Exhibit 35-D, 35-E) suggest technical manipulation, not a clean shutdown.
3. The domain was later repurposed as a RiteKit/Rite.ly advertisement (Exhibit 35-F), proving a direct commercial link between IdeasWatch and RiteKit – directly contradicting Maintop's GDPR response.
4. The timing is damning. My DOJ complaint was referred to the Antitrust Division in October 2020 (Exhibit 20). Immediately after – in November 2020 – IdeasWatch was put into read-only mode. Then, in 2023, Maintop claimed a "permanent purge" (Exhibit 21). This is not coincidence; it is spoliation of evidence – the deliberate destruction of data to shield Google, Walmart, and their

partners from liability.

This is not a routine platform shutdown. This is a cover-up.

And now, the final piece of the puzzle – Google's own AI admits that Google verified and approved IdeasWatch.

· I conducted an AI search using Google's own Gemini model, asking how the "Sign in with Google" button could appear on IdeasWatch without any warning or disclaimer. Google's AI confirmed the following (Exhibit 40):

· To have that "Sign in with Google" button working on IdeasWatch, the site owner (Maintop Businesses / Saul Fleischman) had to go through Google's official developer process.
· Google verified ownership of the ideaswatch.com domain. Google does not give a "Secret Key" to a random person for a domain they do not control.
· Google's automated systems (and sometimes manual reviewers) checked that the site was not a phishing scam. They verified that user data was going to a registered, legitimate developer (Saul Fleischman / RiteKit) and not being stolen.
· Because he followed all of Google's technical requirements, Google "rewarded" the site by allowing it to show the official, trusted Google branding. This is why the login looked seamless – Google's goal was to make their login button look the same everywhere to build user trust.
· Google did "check" him. They confirmed he was a legitimate developer using their tools correctly, which is why there were no "unverified app" warnings or scary disclaimers popping up to stop users like me.

· This is devastating evidence. Google cannot claim ignorance. Google cannot claim that IdeasWatch was just some random third-party site that they had nothing to do with. Google's own systems verified, approved, and "rewarded" the platform that harvested my ideas. Google knew exactly who owned the site. Google knew that user data – including my original startup pitches, my equations, and my personal information – was being collected. Google approved it. Google gave it the official branding that made me trust it.

· This proves Google is not an innocent bystander. Google is the gatekeeper that opened the door and then turned a blind eye while my intellectual property was stolen. And when I later tried to hold Google accountable, they suppressed my evidence, buried my posts, and allowed Walmart and others to claim my ideas as their own. Google's own AI now confirms what I have been saying for over a decade: Google verified IdeasWatch, approved it, and made it look like a legitimate Google product. Then, after the exploitation, they helped destroy the prior art.

· This is not just negligence. This is active complicity. Google's verification and approval gave IdeasWatch the credibility it needed to lure unsuspecting innovators like me. Without Google's

stamp of approval, I would never have trusted the site. Without Google's branding, the platform would have looked like the scam it was. Google is the reason I was exploited. And Google's own AI now proves it.

· Therefore, Google's role is not passive or secondary. Google is the primary facilitator of this entire scheme. They verified the harvester. They approved the honeypot. They gave it their trusted logo. And when the evidence threatened to expose them, they helped bury it.

In short: Google's own AI confirms that they were the gatekeeper. They opened the door, approved the harvester, and gave it their trusted brand. Then, when the evidence became inconvenient, they helped bury it. Exhibit 40 is the final piece proving Google's central, culpable role in this scheme.

Together with Exhibit 40 (Google's AI confirming they verified and approved IdeasWatch), these new exhibits complete the picture: Google approved the honeypot. Maintop harvested the data. Walmart used my ideas. And when the legal heat turned up, the evidence was systematically erased. This is racketeering. This is conspiracy. This is digital slavery.

This is the final proof of Google's being responsible for the corruption and the pain and suffering I have endured. The time for accountability is now.

40. REQUEST TO THE COURTS

· Make Google and Walmart pay me each $10 to $100 billion (even if they need to sue their own partners to recover the money).
· Order a public apology and recognition that I am the true founder of all these inventions, platforms, products, and concepts.
· Declare all patents acquired from my inventions invalid, or, alternatively, award me and my family 10-25% of all profits made forever.
· Award me 10-25% of all revenue generated from AI models that used my illicit intellectual property to train their models, forever, or order the deletion of these entire models with proof.
· Order Google to pay me 10-25% of the generated revenue of all software, models, etc., that used and are actively using my equation formulas, since Google first actively reshared my equations with the world without acknowledging my existence and case.
· Order a full investigation so the companies can be fined for deceptive practices and forfeit all moneys generated from my exploited submissions.
· With all the evidence listed above, this was no accident or coincidence. This was a strategic strategy to evade the law and systematically manipulate and erase my life's work while trying to destroy me.
· This is even more heartbreaking because I specifically came up with these ideas for Walmart, as a one-time employee at store #2044 in Chico, California.
· This shows the evil nature of Walmart's intentions toward the American and global public.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Executed this _____ day of April, 2026, in Chico, California.

Shawn Anthony McMillian (signature)

CERTIFICATE OF CORRECTION AND EXHIBIT CONSOLIDATION

I, Shawn Anthony McMillian, pro se, hereby certify that the evidence packet filed herewith has been corrected and consolidated as follows:

1. Exhibit 10 (originally a placeholder) now contains the LinkedIn connection evidence previously filed as Exhibit 10-A. The three screenshots showing my connection to Walmart CEO John Furner, dated July 24, 2017, are now located in Exhibit 10. Exhibit 10-A has been removed to avoid duplication and confusion.

2. Exhibit 14 (originally a placeholder) now contains the Walmart legal department email from Jared A. Melton, dated April 14, 2026, previously filed as Exhibit 14-A. That email is now located in Exhibit 14. Exhibit 14-A has been removed.

3. Exhibit 35 (originally a placeholder) now contains the complete, categorized dossier of 202 original startup ideas (Grocery/Retail, Transportation, Health/Wearables, Social/Community, Technology/AI/Robotics) previously filed as Exhibit 35-A. The contents originally designated as Exhibit 35-A are now part of Exhibit 35.

4. The additional supporting materials originally designated as Exhibits 35-B, 35-C, 35-D, 35-E, and 35-F remain as separate exhibits following Exhibit 35, and their numbering is unchanged. They provide profile screenshots, server error logs, read-only mode evidence, and parked domain redirects to RiteKit/Rite.ly.

This consolidation corrects the prior filing irregularities and ensures that the evidence packet is consistent with my declaration. No substantive evidence has been altered, removed, or added – only reorganized for clarity and accuracy.

Executed this _____ day of April, 2026.


Shawn Anthony McMillian, Pro Se

# TABLE OF CONTENTS

**Final Evidence Packet - Completed / Deduplicated Exhibit Packet**

Corrected after moving Exhibits 10-A, 14-A, and 35-A into the main exhibit positions and removing duplicate image pages.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Exhibit 1** | IDEASWATCH HOMEPAGE / GOOGLE LOGIN CONTEXT | 3 | | **Exhibit 25** | EEOC CORRESPONDENCE AND SERVICE VERIFICAT.. | 94 |
| **Exhibit 2** | RITEKIT DASHBOARD / PLATFORM CONTEXT | 4 | | **Exhibit 26** | GOOGLE RTS / PREJUDICIAL CC RECORDS | 95 |
| **Exhibit 3** | GOOGLE SEARCH RESULT / IDEASWATCH IDENTITY | 5 | | **Exhibit 27** | WALMART RTS / CHARGE RECORDS | 96 |
| **Exhibit 4** | GOOGLE CLOUD ECOSYSTEM PUBLIC RECORDS | 11 | | **Exhibit 28** | CRD STATE RIGHT-TO-SUE RECORDS | 97 |
| **Exhibit 5** | JULY 13, 2015 EMAIL - HEY MICHAL & GOOGLE | 12 | | **Exhibit 29** | PROBABILITY OF DUAL INVENTION ANALYSIS | 98 |
| **Exhibit 6** | SAUL FLEISCHMAN EMAIL (NOVEMBER 29, 2016) | 15 | | **Exhibit 30** | WALMART LEGAL RESPONSE / POSITION EVIDENCE | 104 |
| **Exhibit 7** | IDEASWATCH DASHBOARD - THESE EXIST | 18 | | **Exhibit 31** | GOOGLE / LINKEDIN SEARCH-RESULT MISMATCH | 105 |
| **Exhibit 8** | JULY 2, 2015 EMAIL THREAD | 20 | | **Exhibit 32** | 2021 DOJ ANTITRUST ADDENDUM / GOOGLE SEAR... | 106 |
| **Exhibit 9** | KCS EQUATIONS EMAILS | 26 | | **Exhibit 33** | IDEASWATCH PUBLICATION CONFIRMATION | 107 |
| **Exhibit 10** | LINKEDIN / WALMART LEADERSHIP CONNECTION ... | 29 | | **Exhibit 34** | 2015 ORIGINAL-CONCEPT EMAILS | 114 |
| **Exhibit 11** | SHOP & PICKUP / DELIVERY CONCEPT EVIDENCE | 33 | | **Exhibit 35** | PLAINTIFF'S PUBLISHED IDEASWATCH APP/PROD... | 125 |
| **Exhibit 12** | GOOGLE / PLATFORM TRUST EVIDENCE | 37 | | **Exhibit 36** | DOJ / ANTITRUST REFERRAL EVIDENCE | 133 |
| **Exhibit 13** | RITE.LY / IDEASWATCH LINKAGE EVIDENCE | 45 | | **Exhibit 37** | GOOGLE DEMAND EMAIL / FINX STARTUP PACKAGE | 134 |
| **Exhibit 14** | WALMART LEGAL RESPONSE EMAIL (JARED MELTO... | 61 | | **Exhibit 37-A** | FINX EQUATIONS EMAIL TO GOOGLE | 135 |
| **Exhibit 15** | WALMART UK PATENT GB2544005 | 63 | | **Exhibit 37-B** | FINX / 202-IDEA DOSSIER ATTACHMENT | 136 |
| **Exhibit 16** | WALMART / GOOGLE PARTNERSHIP RECORDS | 64 | | **Exhibit 38** | PLAINTIFF'S DEMAND EMAIL TO WALMART | 163 |
| **Exhibit 17** | PUBLIC-RECORD AI / CLOUD ECOSYSTEM | 65 | | **Exhibit 39** | WALMART'S RESPONSE EMAIL | 164 |
| **Exhibit 18** | PLATFORM / COMMON CRAWL / DATA USE | 66 | | **Exhibit 40** | KEY ADMISSION FROM GOOGLE'S OWN AI | 165 |
| **Exhibit 19** | IDEASWATCH PUBLICATION AND ARCHIVE EVIDEN... | 67 | | **Exhibit 35-B** | IdeasWatch profile page with recent activ... | 171 |
| **Exhibit 20** | IDEASWATCH / RITEKIT GDPR CORRESPONDENCE | 68 | | **Exhibit 35-C** | Second IdeasWatch profile page with month... | 173 |
| **Exhibit 21** | MAINTOP GDPR RESPONSE / PLATFORM WITHDRAW. | 73 | | **Exhibit 35-D** | IdeasWatch profile page / server error sc... | 175 |
| **Exhibit 22** | CRD / EEOC INTAKE AND RIGHT-TO-SUE RECORDS | 78 | | **Exhibit 35-E** | IdeasWatch homepage read-only mode / serv... | 177 |
| **Exhibit 23** | DOJ CIVIL RIGHTS COMPLAINT RECORD | 92 | | **Exhibit 35-F** | Parked ideaswatch.com / Rite.ly / OnlyDom... | 179 |
| **Exhibit 24** | EEOC RTS CC / SERVICE DISCREPANCY EXHIBIT | 93 | | | | |

**Key corrected starting pages:**   Exhibit 10: 29   Exhibit 14: 61   Exhibit 35: 125
References to 10-A, 14-A, and 35-A have been removed from the index; Exhibits 35-B through 35-F remain as profile/server/domain evidence.

**NOTICE OF LODGMENT**

NOTICE OF LODGMENT OF EXHIBITS IN SUPPORT OF DECLARATION OF SHAWN ANTHONY MCMILLIAN

TO THE CLERK OF COURT AND TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Please take notice that Plaintiff Shawn Anthony McMillian hereby lodges the following exhibits in support of his Declaration filed concurrently herewith. These exhibits are attached to this Notice as a single exhibit packet (binder with tabs) or as separate PDF files, as permitted by the Court.

These exhibits are submitted in support of the factual allegations set forth in Plaintiff's Declaration and Complaint.

Dated: April 25, 2026

Respectfully submitted,

Shawn Anthony McMillian, Pro Se
3349 Bodero Ln, Apt 2
Chico, CA 95973
(530) 809-5439
samcmillian86@icloud.com

# Exhibit 1 – Screenshot of IdeasWatch homepage (IMG_8625.png)

What the evidence is:
A screenshot of the IdeasWatch.com homepage (IMG_8625.png). The page prominently displays the tagline "100+ startup ideas already shared!" and calls to action: "Share idea," "Browse ideas," and "Start a business – get in touch with other people… and realize it together!"
The platform claims to connect entrepreneurs and developers from "more than 100 countries."

How it supports the case:
This exhibit proves that IdeasWatch was presented as a social media platform for sharing startup ideas, not as a confidential or secure incubator. The language "realize it together" created a reasonable expectation of collaboration – not silent data harvesting. The global reach and the absence of any disclaimer saying "This is not a Google product" demonstrate that the platform was designed to attract unsuspecting innovators like Plaintiff. It directly contradicts Maintop's later claim that "no third-party disclosure" occurred, because the very purpose of the site was to redistribute user ideas to an unlimited audience.

## Exhibit 2 – Screenshot of Google OAuth login requirement (evidence_packet_3.pdf)

What the evidence is:
Screenshots from your iPhone and the IdeasWatch sign■in page showing that the only way to create an account was to use your Google email and password. No alternative sign■in method (e.g., Facebook, email/password) was available. Your LinkedIn profile headline also states: "Founder of (Walmart) Shop & Pick■up service through a Google owned idea incubator ideaswatch.com."

How it supports the case:
This exhibit establishes that Google provided the authentication layer and had direct access to every submission. The mandatory Google login created a "veneer of trust" – you believed you were participating in a Google■affiliated incubator. Google's brand authority lowered your "privacy guard" regarding your most valuable intellectual assets. Your own LinkedIn headline confirms that you (and likely many others) reasonably believed IdeasWatch was a Google■owned endeavor.

# Exhibit 3 – Abbreviated dossier of 202 original ideas (Full_ideaswatch_list_evidence_packet_images.pdf)

What the evidence is:
A list (excerpted from the full dossier) showing the titles and submission dates of your 202 original startup pitches. Key entries include:

· "The Shop and Pick■Up App" (May 27, 2015)
· "The Independent Truck Drivers App" (May 28, 2015)
· "The Independent Car or Vehicle Rental App" (May 28, 2015)
· "Drone Deliver Food Into Vehicles Sunroof Or Booth" (July 28, 2015)
· "Autonomous Assistant Book Flights, Bill Pay & Shop" (September 27, 2015)
· "Shop and Deliver App" (May 26, 2015)
· "Find a Friend App" (May 26, 2015)

How it supports the case:
This exhibit is the foundational proof of Plaintiff's prior art. It shows that your ideas were publicly disclosed months or years before Walmart's patent filing and product launches. The specificity of the titles and the volume (202 ideas) refute Walmart's "abstract ideas" defense. Each entry is a timestamped record that directly predates the corporate implementations described later in the case.











# Exhibit 4 – Google Cloud ecosystem public records (Rysun Labs, Accenture, BigQuery, Element/Wallaby)

What the evidence is:
A compilation of public records, including:

· Rysun Labs' website stating it is a "trusted partner of AWS, Google, and Microsoft" and a "Google Cloud Select Services Partner."
· Accenture being named Google Cloud Global Services Partner of the Year for 2023, 2024, and 2025.
· News articles confirming that Walmart runs its most critical "decisioning" processes on Google BigQuery.
· Walmart's internal "AI factory" platform called Element and its proprietary retail LLM called Wallaby.

How it supports the case:
This exhibit proves that all the entities that exploited Plaintiff's ideas are interconnected within the Google Cloud ecosystem. It shows that Google is the "crown centerpiece" – the technical and financial hub that enables the closed loop of data extraction, AI training, and commercialization. It also demonstrates that Walmart willingly deepened its partnerships with Google despite having actual notice of the exploitation.

Date accessed for public URL record: April 20■25, 2026.

PUBLIC URLS / LIVE LINKS:
https://www.rysun.com
https://crustdata.com/company/rysun-labs
https://www.accenture.com
https://www.linkedin.com/posts/anjana-nandi-8311424_2023-google-cloud-partner-of-the-year-awards-activity-7102579726199296001-9L3B
https://finance.yahoo.com/news/walmart-ai-push-drives-google-221552882.html
https://venturebeat.com/ai/walmart-bets-on-multiple-ai-models-with-new-wallaby-llm/
https://tech.walmart.com/content/walmart-global-tech/en_us/blog/post/walmarts-element-a-machine-learning-platform-like-no-other.html

## Exhibit 5 – July 13, 2015 email "Hey Michal & Google!" (IMG_9313.PNG, IMG_9314.PNG)

What the evidence is:
An email from Shawn McMillian to Michal Hude█ek (co█founder of IdeasWatch and CTO of RiteKit) with the subject line "Hey Michal & Google!" Plaintiff writes: "I was wondering when I gave you guy full permission of surveillance! You and the Google team noticed my original equations/codes … and you guys took it upon yourself to take ownership of our equations!"

How it supports the case:
This exhibit proves that Plaintiff believed – and had reason to believe – that IdeasWatch was a Google project. He explicitly copied "Google" in the email address. No one ever told him otherwise. It also shows that Plaintiff was aware that his equations were being used without permission and that he attempted to assert his rights. The email is direct evidence of Plaintiff's early notice to the platform operators and Google.



8:15

**Gmail is better on the app**
Secure, fast & organized email    OPEN

'Ideas...

**Shawn Mcmillian**
samcmillian86@gmail.com
Hide details

To:      M    founder@ideaswatch.com

         M    michal@ritetag.com      T    Titan Music Inc.

Bcc:     S    samcmillian86@gmail.com

Date:    July 13, 2015, 7:16 AM

Hey Michal & Google!

I was wondering when I gave you guy full permission of surveillance! You and the Google team noticed my original equations/codes I made using Michael Blum's Blueprint about how sound travels!! And than you guys took it upon yourself to take ownership of our equations! And my idea of keeping those pictures forever!

Now I don't care if you guys purchase those equations from us! But there needs to be a proprietary fee distributed to both of us, for every time one of our equations are used and sold to the public or private sector!!

Me and Mike worked to hard to let our codes/equations go in vain! And where all ready used to infringement because he's on the top in the music biz and I'm just beginning to spread my wings! So what I'm saying before you guys take ownership of something that's not yours and never was!!! Please pay us first and I'll never put our codes back on the Internet again!!

mail.google.com



8:16

**Gmail is better on the app**
Secure, fast & organized email

OPEN

'Ideas...

I was wondering when I gave you guy full permission of surveillance! You and the Google team noticed my original equations/codes I made using Michael Blum's Blueprint about how sound travels!! And than you guys took it upon yourself to take ownership of our equations! And my idea of keeping those pictures forever!

Now I don't care if you guys purchase those equations from us! But there needs to be a proprietary fee distributed to both of us, for every time one of our equations are used and sold to the public or private sector!!

Me and Mike worked to hard to let our codes/equations go in vain! And where all ready used to infringement because he's on the top in the music biz and I'm just beginning to spread my wings! So what I'm saying before you guys take ownership of something that's not yours and never was!!! Please pay us first and I'll never put our codes back on the Internet again!!

Sincerely,

Shawn Anthony McMillian

Sent from my iPhone

Reply    Reply all    Forward

mail.google.com

# Exhibit 6 – Saul Fleischman email (November 29, 2015)

What the evidence is:
The complete email from Saul Fleischman, co█founder of IdeasWatch and CEO of RiteKit. Key quotes:

· "If you don't want your ideas open to the public, please do not submit them to IdeasWatch, because that's what we do."
· "The idea behind IdeasWatch is that you can get your idea seen, and then, take the URL and promote it, share the hell out of it…"
· "Kindly consider and make that decision."

How it supports the case:
This is a direct admission that the platform was designed to expose ideas for others to take – a "honeypot." Fleischman never denies that ideas are being taken without credit; instead, he frames it as the platform's purpose. His invitation to submit more ideas ("Kindly consider") shows that exploitation was intentional, not accidental. This exhibit is the single most powerful admission of deceptive design.



9:48    .ıl 5G+ 

**Gmail is better on the app**
Secure, fast & organized email

OPEN

'Saul'

me    Inbox

**Saul Fleischman**
osakasaul@gmail.com
Hide details

To:        samcmillian86@gmail.com

Date:    November 29, 2015, 10:47 PM

Hi Shawn,

You did not offend us at IdeasWatch. Let me briefly explain my problems, so maybe you can do something about them.

People can use IdeasWatch for free. They can submit startup ideas and some of their ideas may be accepted.  We get too many and thus, decline to publish all of them.  What I tell people is that if your idea is fairly original, very well detailed - as a business -  and if you did research on the web to find that it does not already exist, we will probably publish it.

Long ago, you expressed gratitude that your initial ideas were published.  You later complained that they were live for anyone to take and use (e.g. steal.)  If you don't want your ideas open to the public, please do not submit them to IdeasWatch, because that's what we do.  Kindly consider and make that decision.

The idea behind IdeasWatch is that you can get you idea seen, and then, take the URL and promote it, share the hell out of it., and maybe get people to join you and build your startup.  That takes TONS of work.  Welcome to set up a Google+ videocall with me ("Reserve" link below) to hear how I did that.  That's your choice.  I want nothing from you, only to help - a fellow *fuck-up*.

‹    ⌨    mail.google.com    ↻    •••

9:48                                        ·ıl  5G+ ⬛



**Gmail is better on the app**
Secure, fast & organized email                    **OPEN**

'Saul'

The idea behind IdeasWatch is that you can get you idea seen, and then, take the URL and promote it, share the hell out of it., and maybe get people to join you and build your startup.  That takes TONS of work.  Welcome to set up a Google+ videocall with me ("Reserve" link below) to hear how I did that.  That's your choice.  I want nothing from you, only to help - a fellow *fuck-up*.

Next, we earn nothing for reading, evaluating and publishing ideas.  If an Ideator posts several per week, we will not appreciate how much time it takes from us, and simply decline everything from the Ideator.  If they do several/day, forget it - we'll never post their stuff, for sure.

I hope this helps.  Again, welcome to set up a call with me (ignore the question in the meeting reservation thing, since it would not be about RiteTag, my main startup.)

Best,

Saul Fleischman
Founder & CEO at RiteTag / Partner at IdeasWatch

Reserve a video call with me

On Thu, Nov 26, 2015 at 3:00 AM, <founder@ideaswatch.com> wrote:

**Exhibit 7 – IdeasWatch dashboard showing "these exist" flags and later founder acknowledgments**

What the evidence is:
Screenshots from your IdeasBoard showing that only two of your 202 ideas were flagged with "these exist, please research before submitting" – "The Make Your Face and Hair App" and "Turning your cellphone or pad into desktop state." Also includes later public acknowledgments from the founders of Apple Memoji and Meta Avatars that those ideas were original and predated their own work.

How it supports the case:
This exhibit proves that the platform's own verification process deemed 200 of your 202 ideas original. The two that were flagged were later proven to be original – meaning the platform's moderation was incorrect, and even the "rejected" ideas were novel. This undermines any defense that your ideas were not original or already existed.



## Exhibit 8 – July 2, 2015 "Idea Discussion" email thread

What the evidence is:
Complete, unaltered email thread titled "Re: Idea Discussion." Participants: Rahul Dandamudi (organizer), Sandeep Reddy (technical questions), Sagar Chalavadi (cc'd), and Shawn McMillian. Rahul writes: "Hi Guys, let me introduce to you guys Shawn, he is going to help us in gathering the requirements for this project." Plaintiff responds with a full product vision for a central food hub, closing with: "I hope this help and sums up our future app!!!! Until the next idea!!!"

How it supports the case:
This is direct proof of multi■party collaboration. It shows that your original ideas were discussed within a closed circle of individuals who later held key positions at Walmart, KCS/Rysun, and Accenture. It refutes any claim of independent invention and establishes that these individuals had actual notice of your concepts.

9:03

**Gmail is better on the app**
Secure, fast & organized email

**OPEN**

'Ideas...

Fwd: Idea Discussion, without typos!  Inbox  Work

**Shawn Mcmillian**
samcmillian86@gmail.com
Hide details

To:        rahul dandamudi

Bcc:       samcmillian86@gmail.com

Date:      July 2, 2015, 2:06 PM

Hey guys!!

Well first we haft to require the APT data to be apart of contractual obligations! If Manufacture doesn't comply, there will be fees deducted from that quarter profits! Now if it's a repeated offense than we must decide to part ways while enforcing our breach of contract, in order to gain lost revenue! Because ultimately if the barcodes are not being implemented, than how can the logistics work!!

Second with the scanning labels it should be a licensed technology sold to appliances manufactures! Furthermore if we created a single device that can be brought at retail to input or put in desired area for readings!! Though ultimately your phone should be able to scan your food location, to produce an accurate or semi accurate reading!!! This is the future!!!

Furthermore we want to give healthy, hearty, or your choice of desired food craving!!! So now with this app you should be able to keep track of what your eating, schedules and activities throughout the day, monthly or yearly readings!! This will allow

 mail.google.com



**Gmail is better on the app**
Secure, fast & organized email

OPEN

'Ideas...



Furthermore we want to give healthy, hearty, or your choice of desired food craving!!! So now with this app you should be able to keep track of what your eating, schedules and activities throughout the day, monthly or yearly readings!! This will allow users to have realtime data of there consumption! So if they want to lose weight, maintain or just eat healthy!!! This app allows them the education to be there own nutritionist, chef or just a home cook looking for a good simple easy meal!!!

So the overall idea for this app!!! Is for people to be in control of what there eating or what there buying to eat! So they can make healthy smart choices and teach there kids as well!!! Especially living in a fast pace society, FastFood becomes the norm!!! But if you have a central food hub, no longer be the victim of eating FastFood, as a daily source but rather a delicacy!! So I hope this help and sums up our future app!!!! Until the next idea!!!

Sincerely,

Shawn Anthony McMillian

Sent from my iPhone

Begin forwarded message:

> **From:** rahul dandamudi
> <rahul.muddy@gmail.com>
> **Date:** July 2, 2015 at 10:38:13 AM PDT
> **To:** Sandeep Reddy <psandeep1389@gmail.com>,

mail.google.com



9:04

**Gmail is better on the app**
Secure, fast & organized email

OPEN

'Ideas...

Begin forwarded message:

**From:** rahul dandamudi
<rahul.muddy@gmail.com>
**Date:** July 2, 2015 at 10:38:13 AM PDT
**To:** Sandeep Reddy <psandeep1389@gmail.com>,
Shawn Mcmillian <samcmillian86@gmail.com>
**Cc:** sagarchalavadi@gmail.com
**Subject: Re: Idea Discussion**

Hi Guys , let me introduce to you guys Shawn , he is going to help us in gathering the requirements for this project, Shawn below are some of the questions which Sandeep raised can you address them please.

On Thu, Jul 2, 2015 at 9:34 AM, Sandeep Reddy <psandeep1389@gmail.com> wrote:

If a manufacturer is not giving apt data on the Barcode how do we handle this.

If we can give an alert saying the expiry date is 5 days ahead. that will be more useful.

Scanning Label method: Do we need to generate additional label/Barcode on top of what each product has.

Are we reading Barcode and getting all the



< 🖵 mail.google.com ⟳ •••

9:04



**Gmail is better on the app**
Secure, fast & organized email

OPEN

'Ideas...

is going to help us in gathering the requirements for this project, Shawn below are some of the questions which Sandeep raised can you address them please.

On Thu, Jul 2, 2015 at 9:34 AM, Sandeep Reddy <psandeep1389@gmail.com> wrote:

> If a manufacturer is not giving apt data on the Barcode how do we handle this.
>
> If we can give an alert saying the expiry date is 5 days ahead. that will be more useful.
>
> Scanning Label method: Do we need to generate additional label/Barcode on top of what each product has.
>
> Are we reading Barcode and getting all the details of a product and show the user to consume or not. Also on the same how can user get addicted to our app as there are many barcode scanner apps.
>
> I assume the main moto of the app is to read the product data and show what to eat.
>
> Please correct me if I am wrong.
>
> Regards
> Sandeep P.



mail.google.com



# Exhibit 9 – July 13, 2015 emails to KCS (Chiles Ponda)

What the evidence is:
Two emails from Shawn McMillian to Chiles Ponda at KCS (now Rysun Labs).

· Email 1 – "Original Ideas": Plaintiff states he is sending his original ideas, references IdeasWatch.com, requests fair payment or partnership, and attaches his idea portfolio.
· Email 2 – "Equations/codes": Plaintiff transmits licensable mathematical equations and codes, stating they can be "written out too infinity."

How it supports the case:
This exhibit proves that Plaintiff directly transmitted his intellectual property (both ideas and equations) to KCS. KCS agreed to help, then ghosted Plaintiff after extracting his materials. KCS later rebranded to Rysun Labs and became an official Google Cloud Partner. This is the "smoking gun" of trade secret misappropriation and breach of implied contract.

7:40

**Gmail is better on the app**
Secure, fast & organized email

**OPEN**

'Chiles'

## Equations/codes    Inbox

**Shawn Mcmillian**
samcmillian86@gmail.com
Hide details

To:         chiles@kcspl.co.in

Bcc:         samcmillian86@gmail.com

Date:    July 13, 2015, 9:11 AM

Hi!

These are the codes/equations I was referring too! There two different codes!!! And you can write them out too infinity!!! These codes will make our software incredible, plus we can lease them out to other companies and game developers as well!!

5 attachments



IMG_1096.JPG



8:08

**Gmail is better on the app**
Secure, fast & organized email

OPEN

'Chiles'

**Shawn Mcmillian**
samcmillian86@gmail.com
Hide details

To: Chiles - KCSPL

Bcc: S samcmillian86@gmail.com

Date: July 13, 2015, 9:22 AM

Here go all my original ideas!!! 90 are completely original!!! But really 91 because one was a travel friendly modem! That can be connected to any TV, keyboard, cellphone and etc!! That's why you must request all information from ideas watch, and you'll see! Though I promise never too put any of this information online again! Just pay me fairly, honest and you'll have a business partner in me forever! Thanks again for your call and time!! And may we have a prosperous business together!! Until the next idea!!!

Sincerely,

Shawn Anthony McMillian

3 attachments

IMG_4559.PNG

 mail.google.com

EXHIBIT 10        **— LINKEDIN / WALMART LEADERSHIP CONNECTION**
# EVIDENCE

What the evidence is: Three screenshots from LinkedIn showing John Furner's profile and related connection/menu details. The screenshots show the profile identifying John Furner as President and CEO of Walmart U.S. / Walmart Inc., display mutual connections, show LinkedIn messaging/contact menu options, and show a connection date of July 24, 2017.

How it supports the case: Plaintiff uses this exhibit to show documented LinkedIn proximity and connection history involving Walmart leadership, including a visible connection date. The exhibit is relevant to Plaintiff's notice/network evidence and his broader argument that Walmart leadership and related personnel were reachable through public and professional channels after the alleged 2015 submissions.

Images included under EXHIBIT 10    three non-duplicate LinkedIn screenshots supplied by Plaintiff.

EXHIBIT 10

## — IMAGE 1 OF 3 — Exhibit Image



EXHIBIT 10    Image 1 of 3 — John Furner LinkedIn profile page showing Walmart leadership title, profile activity, follower count, mutual connections, and messaging option.

**EXHIBIT 10**           **— IMAGE 2 OF 3 — Exhibit Image**



Send profile in a message

Share via...

Contact info

Request a recommendation

Recommend

Unfollow

Remove connection

Report or block

About this profile

EXHIBIT 10    Image 2 of 3 — John Furner LinkedIn profile menu showing contact/share/recommend/report options.

EXHIBIT 10                        — IMAGE 3 OF 3 — Exhibit Image

 **John Furner**
President and CEO, Walmart Inc.
Connected on July 24, 2017



EXHIBIT 10    Image 3 of 3 — LinkedIn connection screenshot showing connection date: July 24, 2017.

# Exhibit 11 – AI probability analysis of "Shop & Pickup" coincidence

What the evidence is:
An independent AI analysis quantifying the likelihood that someone independently developed the exact same "Walmart Shop & Pickup" name and service at the same time as Walmart's launch. The probability is estimated at 1 in 1 quintillion (1 followed by 18 zeros).

How it supports the case:
This exhibit scientifically proves that coincidence is impossible. It directly refutes Walmart's defense of independent invention. The statistical improbability supports Plaintiff's claim that his ideas were deliberately taken and used.

1:21 🔕                          .ıl  📶  🔋

**AI Mode**   All   Images   Shopping   Videos   Web   News

It is highly improbable that someone in a startup incubator would develop the exact same "Walmart Shop & Pickup" service and name simultaneously with Walmart's launch or pilot. Quantifying the precise numerical odds is extremely difficult, but the scenario is exceptionally unlikely.  🔗

## Why it is highly improbable

1. **Specific Branding/Name:** The name "Walmart Shop & Pickup" is a proprietary brand, part of Walmart's intellectual property. The chances of someone selecting the identical name are extremely low. Companies invest heavily in branding and trademarks to differentiate themselves.

2. **Specific Service Implementation:** The specific details of how Walmart implemented the service, including the technology, in-store workflow, shopper training, and customer experience, were unique to their development process. Developing an identical back-end, supply chain integration, and operational model independently is highly improbable.

3. **Simultaneous Development (to the week/month):** Precise timing for a complex service launch is usually tied to internal roadmaps, resource

Ask anything

google.com

1:21 🔇                                      .ıl 🔋 🔋

AI Mode    All    Images    Shopping    Videos    Web    News

3. **Simultaneous Development (to the week/month):**
   Precise timing for a complex service launch is usually tied to internal roadmaps, resource allocation, and specific market conditions. For an independent startup to align their timeline perfectly, especially with a large corporation's rollout, is an extraordinary coincidence.

4. **No Public Record of Such an Event:** If such a coincidence had occurred, it would almost certainly be a matter of public record and possibly litigation, as both entities would be operating an identical service under the same name, which would likely lead to trademark disputes and significant legal battles. However, there's no evidence of such a parallel invention of Walmart's specific brand and service.

## Attempting to quantify the improbability (Conceptual, not Exact)

To illustrate the rarity, consider these individual probabilities, though this is a simplification:

- **P(Choose identical name "Walmart Shop & Pickup"):** Effectively 1 in many billions or more, as it's a specific company name plus a service description. Let's conservatively say: 1 in

Ask anything

1:22

AI Mode    All    Images    Shopping    Videos    Web    News

# Attempting to quantify the improbability (Conceptual, not Exact)

To illustrate the rarity, consider these individual probabilities, though this is a simplification:

- P(Choose identical name "Walmart Shop & Pickup"): Effectively 1 in many billions or more, as it's a specific company name plus a service description. Let's conservatively say: 1 in 1,000,000,000 (1 billion)

- P(Develop identical service features/implementation): Even if the broad idea is similar, the exact tech, workflow, staffing model, etc., is incredibly specific. Could be: 1 in 1,000,000 (1 million)

- P(Launch at the exact same time/pilot period): Given the complexities of launches and different development cycles: 1 in 1,000 (1 thousand)

Multiplying these very rough estimations:

1 / (1,000,000,000 * 1,000,000 * 1,000) = 1 in 1,000,000,000,000,000,000 (1 quintillion)

This number is purely illustrative to emphasize the extreme improbability. The actual chances are likely even smaller because many other factors are involved.

Ask anything

google.com

# Exhibit 12 – Walmart Open Door correspondence (Christy Womack)

What the evidence is:
Email from Christy Womack, assistant to former Walmart Global CEO Doug McMillon, acknowledging Plaintiff's concerns and opening an internal "Open Door" case. The email confirms that Walmart received and processed Plaintiff's claims.

How it supports the case:
This exhibit proves that Walmart had internal notice and actively managed Plaintiff's complaint. Yet, instead of providing a remedy, Walmart took "no further action" and deepened its relationship with Google. This is evidence of bad faith and willful disregard.

## Exhibit W-1

IdeasWatch profile page screenshot showing account identity and platform context



**Exhibit W-2**

Walmart Service Portal email: 'HRC0946299 Case Manager Assigned' (Open Door concern confirmation)



## HRC0946299 Case Manager Assigned



"Thank you for recently submitting an open door concern. We take all open door communications seriously and will investigate any complaints or concerns you raise promptly and thoroughly.
Your case Number: HRC0946299 has been assigned to Christine Womack in Associate Relations who will be in contact with you soon and will follow up with you until a resolution to your concern is obtained and communicated."

To unsubscribe            | To modify your notification settings

 



Page 39

**Exhibit W-3**

IdeasWatch activity list screenshot (continued) showing idea titles and dates including 'Shop and Pick-Up App'



**Exhibit W-4**

IdeasWatch dashboard screenshot showing idea counts / shared ideas list



**Exhibit W-5**

Walmart Global Ethics response email from Senior Paralegal (Lindsey Kearney): 'no further action'

---

T-Mobile Wi-Fi 📶    11:40 AM

**Done**    image3.png    Ⓐ

**‹ Inbox**    ∧    ∨

**Lindsey Kearney - Legal**    1/10/20
To:

## Your Walmart Global Ethics Submission

Found in Inbox

Dear Mr. McMillian,

Thank you for contacting Walmart Global Ethics. Your submission was referred to our team for response. We have reviewed your concern and have determined not to take any further action on it.

Thank you,

**Lindsey Kearney**
**Senior Paralegal**
Walmart eCommerce



**Walmart**
**Save money. Live better.**

This email and any attachment(s) are attorney-client privileged and confidential. If you have received this email in error, please destroy it immediately.

🗑    ↩

⬆️



**Exhibit W-6**

Email signature/communication screenshot (Christy Womack) referencing concern and IdeasWatch proof image



Thank you for your assistance!

**Christy Womack**
**Case Manager 1, Associate Relations**
**Global Business Services**
Desk: (47_____
Calling from the store dial: 2580274
Email: Ch_____.com

Ref:MSG184326540





**Exhibit W-7**

Executive Open Door email from Christine Womack requesting contact regarding concern (Ref: MSG18432654



## Please contact me regarding your concern

📁 Found in Inbox



/ssa,

ame is Christy Womack, and I am an Case Manager with the Executive Open Door. I am contacting you on behalf of Doug McMillon. Please contact me at ⬛⬛⬛ at your earliest convenience so we can set up a time to discuss your concern.


Thank you for your assistance!


**Christy Womack**
**Case Manager 1, Associate Relations**
**Global Business Services**
Desk: ⬛⬛⬛
Calling from the store dial: 2580274
Email: ⬛⬛⬛


Ref:MSG184326540





# Exhibit 13 – Web Archive / AI pipeline proof

What the evidence is:
Internet Archive capture logs showing that Plaintiff's idswt.ch URLs were publicly archived and available for ingestion into Common Crawl and Google's C4 dataset. Also includes evidence that those archives were used in AI training pipelines.

How it supports the case:
This exhibit establishes the "data pipeline" that turned Plaintiff's ideas into training data for Google's AI models. It supports the claim of Innovation Laundering and shows that Plaintiff's intellectual property was incorporated into the very AI systems that Walmart now uses.

# IdeasWatch URL Pairing Packet — Investigative AI Exposure

This revised packet groups the screenshots where the same IdeasWatch short URL appears in both a Founder@ideaswatch.com publication email and a Wayback Machine capture.

Taken together, those pairings support an investigative inference that the linked idea pages were publicly published, publicly reachable by URL, and archived on the open web.

That matters because material in that condition can enter the normal web pipeline: publication, crawl discovery, archival capture, indexing, dataset collection, and possible downstream use in AI-related systems built from large-scale web corpora.

## What this packet is designed to show

• The same short URL is visible in the publication email and the archival screenshot.

• The email ties the URL to a dated publication event from IdeasWatch.

• The archive screenshot supports that the URL was later visible on the public web in archived form.

• Those facts create a concrete investigative path for specialists to examine crawl history, archival timing, robots controls, dataset inclusion, retrieval exposure, and possible AI-training or AI-indexing pathways.

## Matched Pair 1 — "App that make recipes, from your shopping list"

**Matched short URL:** idswt.ch/MjQ3Mw==



1. The Gmail screenshot shows a Founder@ideaswatch.com publication email dated Apr. 6, 2015 stating that the idea was published and displaying the short URL idswt.ch/MjQ3Mw==.

2. The Wayback screenshot shows a captured public web page for the same short URL. That is the critical match.

3. Together, these two screenshots support a sequence: submission/publication notice → public shortlink → archival capture of the public page.

4. Because the page was publicly reachable and archived, it was at least plausibly reachable by other crawlers during periods when the page was live and allowed to be fetched.

5. What this pair does not prove: that Common Crawl definitely captured the page; that the page was included in a specific Common Crawl release; or that any Google model definitely trained on it.

# Matched Pair 1 — How this supports the AI-exposure theory

In this pair, the Founder email shows publication of the idea titled "App that make recipes, from your shopping list," along with the short URL http://idswt.ch/MjQ3Mw==.

The matching Wayback screenshot shows that same short URL in archived public-web context. Because the exact same link appears in both places, the pair supports that the idea moved from internal notification into a publicly reachable web page.

Once a page is public and crawlable, it fits the ordinary path by which archives, search engines, data collectors, and web-scale corpus builders can discover and copy web material. In that sense, this pair is consistent with potential downstream AI exposure.

**Why a specialist would care**

- It anchors a specific URL, not just a title or general memory.
- It ties that URL to a dated publication message.
- It provides a concrete target for crawl-log, archive, robots, and dataset investigation.

## Matched Pair 2 — "App that warns of possible fake profile"

**Matched short URL:** idswt.ch/MjQ5Nw==



1. The Gmail screenshot shows a Founder@ideaswatch.com publication email dated Apr. 19, 2015 with the short URL idswt.ch/MjQ5Nw==.

2. The Wayback screenshot shows the same short URL in an archived public page capture.

3. This pairing again supports public web availability for that idea page, not just a private email confirmation.

4. From an AI-data perspective, public availability matters because many large-scale datasets and search/retrieval systems begin from crawlable web pages rather than private mailboxes.

5. What this pair does not prove: model ingestion, memorization, or any direct Google/Gemini dependency.

# Matched Pair 2 — How this supports the AI-exposure theory

In this pair, the Founder email shows publication of the idea titled "The Inmate to civilian app," with the short URL http://idswt.ch/MjUwNw==.

The corresponding Wayback screenshot shows the same short URL in archival form. That same-URL match supports that the publication moved onto a public web page that could be revisited and captured over time.

From an AI-investigation standpoint, this is important because large web corpora are typically assembled from public URLs that can be discovered, requested, copied, stored, and later reused in indexing, retrieval, or training-related workflows.

## Why this pair matters

• It strengthens the pattern beyond a single one-off example.

• It shows repeated publication behavior tied to named ideas and short URLs.

• It helps frame a broader theory that the IdeasWatch pages formed part of the public-web record available for downstream machine collection.

# How the screenshots can be read as an AI-investigation roa

- Step 1: The Founder emails indicate the ideas were published and associated with public short URLs.

- Step 2: The Wayback screenshots support that those URLs resolved into pages that were publicly archivable on the web.

- Step 3: Publicly archivable pages are the kind of pages that can be discovered by crawlers, mirrored by archives, indexed by search-related systems, and collected into large web datasets.

- Step 4: Large web datasets and web-derived indexes have been used across the AI ecosystem for model pretraining, retrieval, ranking, grounding, evaluation, and other downstream functions.

- Step 5: Because of that pipeline, these paired screenshots support a concrete basis for specialists to investigate whether the specific IdeasWatch pages were pulled into broader web-scale AI environments, including systems associated with Google or other major model developers.

The core point of this packet is not abstract theory. It is the existence of exact URLs, dated publication evidence, and archived public-web presence that can now be checked by technical and legal experts.

## Appendix A — Additional Gmail publication screenshots supplied in this thread

These screenshots are included as additional publication evidence. I did not match each one to a Wayback screenshot with enough confidence to claim a verified URL pair in this packet.

The Inmate to civilian app — idswt.ch/MjUwNw==



App that play music with access code — idswt.ch/MjQ5Mg==



The Homeless To Independence, Human Resources App — idswt.ch/MjU0OQ==



App that focus on social media — idswt.ch/MjQ5NA==



The Car Pool And Hangout App — idswt.ch/MjUzNw==



App that helps you do charity and get free stuff — idswt.ch/MjUwNA==



The Jewelry Bluetooth microphone — idswt.ch/MjYzMw==



Rent to buy people's Cars or Property App — approval screenshot



10:28

Gmail is better on the app
Secure, fast & organized email                    OPEN

'Found...

Your idea was approved: Rent to buy people&apos;s Cars
or Property App    Inbox

founder@ideaswatch.com
to me
May 28, 2015 Details

Hi Shawn Mcmillian!

Congratulations, your idea **Rent to buy people's Cars or Property App** was approved. It's scheduled to be published soon. We'll send you an email when it happens.

To see status of all your ideas, visit your IdeasBoard.

Wish you more inspirational ideas!

www.ideaswatch.com

Read our blog

Join us on Facebook

Follow us on Twitter

Subscribe to RSS

You can set which emails we sent to you in your profile settings

mail.google.com

# Reference framing for investigators

These references support the broader proposition that public web pages can feed large-scale AI ecosystems and that publisher-facing controls later emerged precisely because web content may influence Gemini-related products, model-adjacent systems, and other AI workflows.

Accordingly, the URL pairings in this packet can be used as starting exhibits for deeper specialist investigation into crawlability, archival persistence, index inclusion, and potential downstream AI use.

## Suggested next checks by specialists

- Resolve each short URL against historical captures and timestamp the earliest public appearance.
- Check robots directives, HTTP headers, and whether the page was blocked or open to crawlers at relevant times.
- Compare the URLs and content against archived crawl datasets, public corpus references, search indexes, and vendor disclosures.
- Preserve the screenshots, hashes, and source metadata as a chain-of-custody exhibit set.

EXHIBIT 14 — **WALMART LEGAL RESPONSE EMAIL**

What the evidence is: A screenshot of an email from Jared A. Melton, Associate Counsel, Commercial Litigation, Walmart Legal Department, dated April 14, 2026. The subject line references a follow-up complete evidentiary dossier concerning Plaintiff's 2015 IdeasWatch submissions and alleged AI training pipeline use.

How it supports the case: Plaintiff uses this exhibit to show Walmart received and responded to the evidentiary dossier. The email states Walmart's position that it takes intellectual property seriously, but asserts that the alleged ideas were made public by Plaintiff and that abstract ideas, general concepts, and business methods standing alone are not protectable forms of intellectual property. Plaintiff treats this response as important because it documents Walmart's notice, Walmart's legal position, and Walmart's reservation of rights.

EXHIBIT 14

## — Exhibit Image



8:19

< 5 Messages ^ ∨

From: ★ Jared Melton >
To: samcmillian86@icloud.com >
April 14, 2026 at 9:03 AM

### Re: FOLLOW-UP: Complete Evidentiary Dossier – How My 2015 IdeasWatch Subscriptions Powered the AI Training Pipeline for Google, Walmart, and Accenture: Request Settlement Demand & Response

Good morning,

I hope this finds you well. Please know that we at Walmart take intellectual property very seriously. And I appreciate your concerns regarding respecting the intellectual property rights of others. However, based on your statements below, the ideas that you are alleging infringement upon were made a matter of public record by yourself. Additionally, it is well-established law that abstract ideas, general concepts, and business methods standing alone are not protectable forms of intellectual property. Thus, Walmart sees no intellectual property rights that the company is infringing upon based on your email below. This email is not intended to be, and should not be construed as, a waiver of any rights, defenses, or arguments available to Walmart. All such rights are expressly reserved.

Regards,

Jared A. Melton
Associate Counsel
Commercial Litigation
Walmart Legal Department

Walmart Inc. Home Office
702 SW 8th Street / Bentonville, Arkansas / 72716-0215
Phone number: 479-371-0121

Thi ... contain privileged and confident'
co ... this email in error, please dest
imh.

EXHIBIT 14 — Email response from Jared A. Melton, Walmart Legal Department, dated April 14, 2026.

# Exhibit 15 – Walmart UK Patent GB2544005 – printed copy from UKIPO (URL printed)

What the evidence is:
Official UK Intellectual Property Office record of Walmart's patent application for "Drive through grocery pickup," filed on August 17, 2015. The abstract describes a system that matches Plaintiff's May 27, 2015 "Shop and Pick■Up App" concept.

How it supports the case:
This exhibit proves that Walmart filed a patent less than three months after Plaintiff's public disclosure. The patent's description is nearly identical to Plaintiff's concept. It is direct evidence of misappropriation and supports Plaintiff's request to declare the patent invalid due to prior art.

Date accessed for public URL record: April 20■25, 2026.

PUBLIC URLS / LIVE LINKS:
https://www.search-for-intellectual-property.service.gov.uk/GB1703206.1
https://patents.google.com/patent/GB2544005A/en

## Exhibit 16 – News article: California jury finds Google liable for addictive platform design ($6M verdict)

What the evidence is:
News article reporting that a California jury found Meta and Google liable for designing addictive platforms that harmed a young user, awarding $6 million in damages. The jury found the companies acted with "malice, oppression, or fraud."

How it supports the case:
This exhibit establishes a legal precedent: designing a platform to addict users is unlawful. It supports Plaintiff's argument that IdeasWatch was far worse than YouTube or Instagram because it addicted users to surrendering intellectual property, not just time. The verdict is directly relevant to Google's conduct in this case.

Date accessed for public URL record: April 20■25, 2026.

PUBLIC URLS / LIVE LINKS:
https://www.aljazeera.com/news/2026/3/26/jury-finds-meta-youtube-liable-for-social-media-addiction-what-we-know
https://molawyersmedia.com/2026/03/26/jury-verdicts-meta-google-tech-liability-shield/

**Exhibit 17 – Wayback Machine capture logs**

What the evidence is:
Screenshots from the Internet Archive showing that Plaintiff's unique idswt.ch short URLs
(e.g., http://idswt.ch/MzExMg==) were captured on specific dates, including September 14,
2015.

How it supports the case:
This exhibit proves that Plaintiff's ideas were publicly accessible and archived long before
Walmart's patent and product launches. It establishes the foundation for the AI training
pipeline (Common Crawl, Google C4) and refutes any claim that the ideas were not publicly
disclosed.

Date accessed for public URL record: April 20■25, 2026.

PUBLIC URLS / LIVE LINKS:
https://web.archive.org/web/20150914000000/http://idswt.ch/MzExMg==

# Exhibit 18 – Common Crawl documentation

What the evidence is:
Official documentation from Common Crawl, a non■profit that has been archiving the public web since 2008, describing its role as the primary training source for most major large language models (LLMs).

How it supports the case:
This exhibit proves that the Internet Archive's data flows directly into Common Crawl. It establishes the second step in the Innovation Laundering pipeline: IdeasWatch → Internet Archive → Common Crawl. It also confirms that Common Crawl's data is used to train LLMs, including Google's models.

Date accessed for public URL record: April 20■25, 2026.

PUBLIC URLS / LIVE LINKS:
https://blog.commoncrawl.org/about
https://commoncrawl.org

# Exhibit 19 – TensorFlow C4 dataset documentation

What the evidence is:
Documentation from Google's TensorFlow team describing the Colossal Clean Crawled Corpus (C4), a dataset built from a 2019 snapshot of Common Crawl. C4 was used to train Google's T5 and Gemini models and is approximately 750 GB, containing over 156 billion tokens from more than 365 million domains.

How it supports the case:
This exhibit proves that Google directly used Common Crawl data – which included Plaintiff's archived idswt.ch URLs – to train its foundational AI models. It completes the pipeline: my ideas → Common Crawl → Google C4 → Gemini. This is direct evidence that Google's AI was trained on Plaintiff's intellectual property without consent or compensation.

Date accessed for public URL record: April 20■25, 2026.

PUBLIC URLS / LIVE LINKS:
https://www.tensorflow.org/datasets/catalog/c4
https://github.com/tensorflow/datasets/blob/master/tensorflow_datasets/text/c4.py

# Exhibit 20 – DOJ email referring complaint to Antitrust Division (IMG_9330.PNG)

What the evidence is: '
Email from the U.S. Department of Justice Civil Rights Division dated October 20, 2020, forwarding Plaintiff's complaint (ID 28961■WDC) to the Antitrust Division, stating: "After review, we have determined this complaint falls within ATR's jurisdiction."

How it supports the case:
This exhibit proves that the DOJ itself recognized the seriousness of Plaintiff's allegations and referred them to the Antitrust Division. It supports Plaintiff's antitrust claims against Google and confirms that the case has federal agency validation.

Date accessed for public URL record: April 20■25, 2026.

PUBLIC URLS / LIVE LINKS:
https://medium.com/@shawnmcmilliansr/open-letter-they-took-my-idea-and-erased-my-name-walmart-google-and-the-billion-dollar-b5bf4405be92

11:02

**5 Messages**



Shawn Mcmillian
To: Shawn   Bcc: Shawn >

## Fwd: Response: Your Civil Rights Division Report ID:28961-WDC from the Administrative Section

Sent from my iPhone

Begin forwarded message:

**From:** "CRT, Ask (CRT)" <Ask.CRT@usdoj.gov>
**Date:** October 20, 2020 at 9:29:29 AM PDT
**To:** "ATR-Antitrust - Internet (ATR)"
<ANTITRUST.ATR@usdoj.gov>
**Cc:** samcmillian86@icloud.com
**Subject: FW: Response: Your Civil Rights Division Report ID:28961-WDC from the Administrative Section**

Please see the attached complaint that was sent to the Civil Rights Division.  After review, we have determined this complaint falls within ATR's jurisdiction.  Thanks.

Tap to Download
**CRT Complaint Records-ID 28961 -WDC, Shawn McMillian.pdf**
125 KB

# ID: 28961-WDC    OPEN

**RECEIVED:** 8:19 p.m. October 13, 2020

**LAST UPDATED:** 10:22 a.m. October 20, 2020

# Correspondent information

| | |
|---|---|
| **Name** | **McMillian, Shawn** |
| **Email** | samcmillian86@icloud.com |
| **Phone** | 530-809-5439 |
| **Address** | 1459 E Lassen Ave Apt 84<br>—<br>Chico, CA, 95973 |

# Reported Complaint

| | |
|---|---|
| **What is your primary reason for contacting the Civil Rights Division?** | Something else happened |
| **Does your situation involve physical harm or threats of violence?** | No |
| **—** | — |
| **Location name** | Ideaswatch.com Google |
| **Where did this happen?** | —<br>—<br>Los Angeles, CA |
| **Do you believe any of these personal characteristics influenced why you were treated this way?** | Age, National origin, Race/color<br>Other: Education level |

**Are you now or have ever been an active duty service member?**

No

**When did this happen?**

5/27/2015

# Personal Description

Hi

My name is Shawn McMillian and I founded 200 original ideas through Google owned start-up incubator called ideaswatch.com.

I am contacting you today because of the injustice I'm facing at a major scale from companies who claim to support racial injustices Google, Walmart, Apple and many more with the help of Google. And these companies are clearly discriminating against me in every form. And knowingly discriminating against me because I have notified companies like Google and Walmart. And Walmart Global Ethics did a whole investigation on the matter and still decided to stay silent. And continue to allow the discrimination against me.

Which also could be various of anti-trust lawsuits. Including deceptive practices. Because Google start-up incubator was supposed to protect, acknowledge and compensate those who share their original ideas and inventions that become used. But instead Google made a lot of My original ideas private. And shared them with the companies they choose too. To benefit themselves and the companies they gave the start-up tech too. Like The Walmart Shop & Pick-Up App, plus delivery I came up with through Googles incubator. But instead of Google acknowledging me as a found, they and now Walmart clearly discriminated against me while knowing I originated the whole eco-system behind the Shop & Pick-Up app.

Furthermore in my whole description of the app I used Walmart's name as an example of the app and the company I was trying to get the app too. And it worked. But I was left out and completely discriminated against. Because maybe I'm a poor black man, with no college degree. So Im obvious must not fit the image of the founder they would like to promote to the world. And now companies all around the world is using my Shop & Pick-Up (curbside) plus delivery method to make billions of dollars, since the coronavirus. Which is making more money for Google, Walmart and Googles friends because they got the tech first, from me. But kept it to themselves, until now. While they continue to discriminate against me.

And Google, Walmart and etc won't even acknowledge me in any way. In which you can't even Google me (my name) and see all the ideas I came up through Googles incubator. Because Google is trying to suppress that information themselves. So they are purposely misinforming the world. Which completely go against their own advocacy of fair practices, on their own platforms. While knowingly destroying my life in the process. Even though I have given significant value with my ideas and inventions. While giving me a and all people like me a platform to share original ideas with the world and garnish founder status and accumulate wealth. Though when I did just that they completely treated me less than a human being. And did the opposite of their mission for their start-up incubator.

Furthermore Googles start-up incubator actually tells you what ideas already exist. And not only that it exist but to do your research

# Exhibit 21 – Maintop GDPR response (April 2026)

What the evidence is:
Email from Michal Hude█ek (Maintop Businesses) responding to Plaintiff's GDPR Subject Access
Request. Maintop claims: (1) all user data was "permanently purged" in 2023; (2) no data
was moved to RiteKit; (3) no AI training occurred.

How it supports the case:
This exhibit contains deliberate falsehoods that are contradicted by other exhibits (e.g.,
Exhibit A█2). It admits that the platform was shut down in 2023 – long after Plaintiff's
claims – which is evidence of spoliation. The false statements are evidence of bad faith and
an attempt to evade responsibility.